Donovan SMALL, As the Special Administrator of the Estate of Teresa Small, Deceased, Plaintiff and Appellant,

v.

The McKENNAN HOSPITAL, Art Canary, and Don Kinder, Defendants and Appellees.

No. 15342.

Supreme Court of South Dakota.

Argued Nov. 19, 1986.

Decided April 1, 1987.

Rehearing Denied May 7, 1987.

Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiff and appellant; Gregory A. Eiesland of Lynn, Jackson, Shultz & Lebrun, Rapid City, on brief.

Paul T. Barnett of Siegel, Barnett & Schutz, Sioux Falls, for defendant and appellee McKennan Hosp.

John W. Bastian, Asst. Atty. Gen., Pierre, for defendants and appellees Art Canary and Don Kinder; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

MORGAN, Justice.

Donovan Small (Donovan), plaintiff in this action, appeals from summary judgments granted to defendants McKennan Hospital (Hospital), Art Canary (Canary), and Don Kinder (Kinder). We affirm in part, reverse in part, and remand.

This case stems from the abduction, rape, and murder of Teresa Small (Teresa), the wife of Donovan. At about 7:30 p.m. on the night of October 12, 1982, Teresa was abducted by Rocky Blair as she entered the elevator on the third floor of the parking ramp at McKennan Hospital in Sioux Falls, South Dakota. Blair, who was a recent parolee from the South Dakota State Penitentiary, forced Teresa into his vehicle and shortly thereafter drove out of the parking ramp. Teresa was subsequently raped and murdered by Blair.

Prior to Teresa's abduction, Blair was parked on the third floor of the hospital parking ramp. At the time he was consuming alcoholic beverages and smoking marijuana. Blair had been in the parking ramp anywhere from fifteen to forty-five minutes prior to the arrival of Teresa. Teresa was an employee of Hospital, however, her purpose for being in the parking ramp on this occasion was to deliver her mother's car so her mother could drive home after work. Teresa did not enter the hospital, but rather proceeded to enter the elevator in an attempt to leave the parking ramp.

Hospital is located in an older residential section of Sioux Falls composed mainly of single-family dwellings. Deposition and affidavit testimony indicate that this area is considered a low-crime area. There were no other similar incidences that occurred in or around the parking ramp since its completion in 1979. It is undisputed, however, that there were several incidents on the ramp including reports of stolen car batteries, stolen gasoline, smashed windows, broken antennaes, intoxicated and disorderly people, and lug bolts being taken off or loosened. In addition, from time to time the ramp had been littered with beer cans and alcoholic beverage bottles, and on one occasion human feces were found in the elevator. Security personnel, in deposition testimony, also stated that they were aware of two or three complaints about nurses being followed near the hospital and were also aware of an incident that occurred approximately twelve to fifteen years prior where a nurse was hit over the head and dragged toward a car. The security officers also reported incidents where they took knives away from people in and around the hospital. At least one security officer was concerned about the nurses' safety at the ramp and reported being told by people that they would not park in the ramp due to the dangers involved.

The chief security officer, according to his deposition testimony, requested increased security every year since his original employment but was turned down on

each occasion. He also acknowledged that lighting is a deterrent to criminal activity and stated that there was a "concensus of opinion that there maybe should have been more light in the [parking ramp]."

Donovan also presented an expert witness who outlined what he claimed to be serious shortcomings in security at the hospital and specifically the parking ramp. Information was presented to show that the lighting in the parking ramp did not meet industry standards. The expert also testified that in his opinion security at the parking ramp was inadequate and that the abduction was foreseeable.

Initially, we note that Hospital and Donovan disagree on Teresa's status while she was in the parking ramp. Hospital contends that Teresa was a licensee while Donovan contends that she was an invitee. In its memorandum opinion, the trial court found that Teresa was an invitee. Hospital failed to file a notice of review on this finding by the trial court; thus, we will not address this issue. *State v. Holland*, 346 N.W.2d 302 (S.D.1984); *Application of Northwestern Bell Tel. Co.*, 326 N.W.2d 100 (S.D.1982); SDCL 15–26A–22. For purposes of this appeal, Teresa was an invitee.

The issue we must address that concerns Hospital is the foreseeability of the abduction, rape, and murder of Teresa. The trial court was correct when it stated that "[t]he pivotal issue is the foreseeability of the incident." Hospital and the trial court rely on authorities that establish prior similar acts as determinative in foreseeability questions. The trial court specifically stated "the test of foreseeability seems to depend on whether there were prior incidents which should have alerted the hospital to the necessity of instituting preventative measures." Representative cases supporting this theory are *C.S. v. Sophir*, 220 Neb. 51, 368 N.W.2d 444 (1985) and *Foster v. Winston-Salem Joint Venture*, 50 N.C. App. 516, 274 S.E.2d 265 (1981) modified, 303 N.C. 636, 281 S.E.2d 36.

Both *Sophir* and *Foster* involved facts somewhat similar to this case and resulted in summary judgment for the defendant. In *Sophir*, the Nebraska Supreme Court upheld summary judgment even though an identical incident occurred approximately two months prior. The Nebraska court pointed out that landlords are not insurers and that there is no duty to warn of a known danger. According to the Nebraska court: "The ordinary, reasonable person is aware or should be aware that open parking lots provide an optimum place for crime to occur." *Sophir*, 368 N.W.2d at 446. The *Foster* court held that landowners are "responsible for protecting their business invitees from the foreseeable criminal action of third parties." *Foster*, 274 S.E.2d at 267. The court went on, however, to hold that thirty-six reported criminal incidents in a seventy-six acre parking lot in the same year, involving six or seven assaults against the person, should not have placed defendants on notice that a dangerous condition existed. The Supreme Court of North Carolina on subsequent appeal reversed the summary judgment and remanded for trial on the merits. *Foster*, 281 S.E.2d at 38.

The California Supreme Court in *Isaacs v. Huntington Memorial Hosp.*, 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653 (1985), was presented with a situation very similar to the case at hand. The *Isaacs* court refused to allow the lack of prior similar incidents to be determinative of foreseeability, opting instead for a "totality of the circumstances" test. The opinion is well reasoned and notes that the "prior similar incidents" rule "contravenes the policy of preventing future harm. Moreover, under the rule, the first victim always loses, while subsequent victims are permitted recovery.... Surely, a landowner should not get one free assault before he can be held liable for criminal acts which occur on his property." *Isaacs*, 38 Cal.3d at 125, 211 Cal.Rptr. at 361, 695 P.2d at 658.

The *Isaacs* court also points out that various trial courts may differ as to what is a "similar" incident and may have trouble defining time and territory limits for purposes of determining foreseeability. The

California court also correctly notes that foreseeability is ordinarily a question of fact. Several other courts have also held that it was prejudicial error to grant summary judgment for defendants in cases with similar facts. *Paterson v. Deeb*, 472 So.2d 1210 (Fla.App.1985); *Roettger v. United Hospitals of St. Paul*, 380 N.W.2d 856 (Minn.App.1986). *See also Butler v. Acme Markets, Inc.*, 89 N.J. 270, 445 A.2d 1141 (1982).

▇ We believe that strict adherence to the "prior similar acts" rule is unduly restrictive and places too great a burden on the plaintiff. As we noted in *Ward v. LaCreek Electric Association*, 83 S.D. 584, 588, 163 N.W.2d 344, 346 (1968): "The duty to foresee a risk of harm is dependent upon all the surrounding facts and circumstances and may require further investigation or inquiry before action is taken." *See Johnson v. Straight's Inc.*, 288 N.W.2d 325 (S.D.1980). In light of the foregoing, we believe that the learned trial judge erroneously applied the "prior similar acts" rule in lieu of the "totality of the circumstances" rule.

▇ Our inquiry may not end there, however. We must now determine whether the plaintiff has presented enough facts to create a jury question under the "totality of the circumstances" rule. We believe that testimony concerning the prior criminal activity in and around the parking ramp, coupled with the testimony of the expert witness outlining the security inadequacies of the parking ramp, establishes a fact question for the jury on the issue of foreseeability. Furthermore, we also note at this point that Hospital was aware of the increased crime risk associated with parking ramps and hospital areas. This knowledge is demonstrated by the several advisories included in the staff newsletter by the hospital administration. Since the trial court applied the wrong test to determine foreseeability and as a result erred in granting summary judgment, we reverse and remand for trial.

In addition to the cause of action brought against Hospital, Donovan brought a cause of action against Canary, the Executive Director of the Board of Pardons and Paroles, and Kinder, Blair's parole officer. Donovan claims that Canary was negligent in preparing a report on Blair that was submitted to the Board of Pardons and Parole and that Kinder was negligent in supervising Blair while Blair was on parole. The trial court granted summary judgment for Canary and Kinder. Canary's actions, according to the trial court, did not proximately cause the death of Teresa Small. In addition, the trial court held that Kinder was under no duty to Teresa since he did not "take charge of" or "control" Blair.

Initially, we point out "that the existence of a duty of care on the part of a defendant to a plaintiff is an essential element of a negligence action." *Barger for Wares v. Cox*, 372 N.W.2d 161, 167 (S.D.1985). Furthermore, "[t]he existence of a duty is a question of law to be determined by the court." *Id.* In *Barger for Wares*, we examined the duty to control the conduct of a third person, namely, an employee. In that case, we quoted Restatement (Second) of Torts § 315 (1965) which provides:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

The special relations spoken of in § 315 are outlined in §§ 316–319. Section 319 has specific application to the instant case. "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319 (1965). We must determine if Canary and Kinder took charge of Blair.

Contrary to the contentions of Donovan in his initial brief, we think it is obvious that Canary did not take charge of Blair or exercise control over him. We note that this duty to control argument was restricted to Kinder in Donovan's Reply Brief. Kinder comes much closer to taking charge of Blair. We believe, as did the trial court, that the case of *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985), is dispositive of this issue.

In *Lamb*, suit was brought against a probation officer for failing to report alcohol-related offenses committed by a probationer subsequent to his probation. The probationer was convicted of armed robbery and sentenced to prison. After serving some prison time, the court placed the probationer on supervised probation for the remainder of his term. As part of his probation, he was to obey all laws, not possess any firearms, and participate in alcohol treatment. Probationer subsequently had several arrests for DWI and other alcohol-related offenses but the probation officer failed to report these offenses to the court supervising the probation. Probationer was ultimately involved in a vehicle collision that seriously injured a young child. At the time of the collision, probationer was under the influence of alcohol.

■ The *Lamb* court conducted a thoughtful and searching analysis on the issue of whether the probation officer had taken charge of the probationer and ultimately concluded that he had not.

> Here, the relationship between the probation officers and the probationer was continuing in the sense that the probationer was placed on probation for an extended period of time. However, that does not mean that the officers had taken charge of the probationer. The probationer was essentially free to conduct his day-to-day affairs, and was responsible for reporting certain activities to his probation officers as they arose or as they were scheduled. In addition, unlike the more typical custodial situations, the officers were evidently not responsible for supervising the probationer on a daily basis. Therefore, because there was no custodial relationship involved in this case, we conclude that the officers did not take charge of the probationer.

*Lamb*, 303 Md. at 248, 492 A.2d at 1304. The facts in the instant case indicate that substantially similar arrangements were present between Kinder and Blair. Even though Blair was placed on maximum supervision status, he was allowed to live apart from the penitentiary and also was employed, though it appears he had not reported to his job prior to the killing. Blair was not supervised on a daily basis by Kinder. The maximum supervision status required Kinder to see Blair at least twice a month and also required a home visit and employment check each month. The supervision required by the Board's rules for maximum supervision does not rise to the degree of "taking charge" contemplated by § 319.

Donovan relies heavily on the case of *Grimm v. Arizona Bd. of Pardons & Paroles*, 115 Ariz. 260, 564 P.2d 1227 (1977), to support his argument that Kinder had a duty to control Blair. We do not find this case persuasive. The case involved the liability of members of the Board of Pardons and Paroles and its chief holding dealt with the sovereign immunity of those board members. In our view, the duties created by §§ 315 and 319 do not extend to include persons such as members of the Board of Pardons and Paroles and parole officers. We note that the *Grimm* case was severely limited in 1984 when the Arizona Legislature passed a statute granting immunity to employees such as board members of the Board of Pardons and Paroles and parole officers. A.R.S. § 12–820.02 (Supp.1986).

In addition to the duty of control argument, Donovan asserts that Canary had a statutory duty to Teresa under SDCL 24–15–2.* Since Canary fulfilled the require-

* SDCL 24–15–2 states:

> The executive director of the board of pardons and paroles in preparing each case history

ments of SDCL 24–15–2, we do not reach the question of whether this statute places an enforceable duty on Canary for the benefit of Teresa.

█ Although the parties disagreed on the adequacy and content of the commutation file prepared by Canary, we find that the file meets the requirements of SDCL 24–15–2. Contrary to the statements of Donovan's counsel at oral argument, statements from judges, state's attorneys, and law enforcement personnel were included in the commutation file. The file also contained the complete criminal record of Blair as kept by the Federal Bureau of Investigation. The file contains Blair's criminal history and a copy of the penitentiary record specifying each infraction of rules and the disciplinary action taken. In addition, the file shows conclusively that Canary enlisted the services of the sheriff, the state's attorney, and circuit judges who had information concerning Blair. We believe that the thirty-one page commutation file was adequate to meet the requirements of SDCL 24–15–2.

The trial court erred in granting summary judgment to Hospital on the issue of foreseeability, therefore, we reverse and remand for trial on that issue. We affirm the summary judgments granted to Canary and Kinder. We affirm in part, reverse in part, and remand to the trial court.

WUEST, C.J., SABERS, J., and FOSHEIM, Retired Justice, concur.

HENDERSON, J., concurs in part and dissents in part.

shall:
> (1) Adopt and implement a procedure by which a report will be completed to contain the life history of each inmate;
> (2) Receive from the warden of the penitentiary a copy of the true record of each inmate which specifies each infraction of rules and the disciplinary action taken; and
> (3) Enlist the services of any sheriff, state's attorney, circuit judge, or other officer who may have knowledge concerning each inmate, or circumstances surrounding the commission of the crime for which he was sentenced, or his previous history.

MILLER, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

HENDERSON, Justice (concurring in part, dissenting in part).

In concurring with the majority opinion on the reversal aspect of this decision, the effect of which is to declare that there is a question of fact for a jury to determine the liability of the hospital on a dangerous condition of premises—where an invitee is injured (in this case, abducted, raped, and murdered)—see: my continuum of legal theory as reflected in a dissent in *Mortenson v. Braley*, 349 N.W.2d 444, 446 (S.D. 1984); a special concurrence in *Kryger v. Dokken*, 386 N.W.2d 481, 484 (S.D.1986); and a special concurrence in *Mitchell v. Ankney*, 396 N.W.2d 312, 316 (S.D.1986).[1] *See also Nicholas v. Tri-State Fair & Sales Ass'n*, 82 S.D. 450, 454–55, 148 N.W.2d 183, 185 (1967).

From *Nicholas*, we learn that possessors of land are liable for injuries incurred during the course of business, to the public at large, if the land is held open for business purposes. There is an obligation to visitors or invitees "to provide safe arrangements for the entrance and departure of people." *Nicholas*, 82 S.D. at 455, 148 N.W.2d at 186 (citing *Camp v. Wood*, 76 N.Y. 92, 32 Am. Rep. 282 (1879); *Gray v. First Nat'l Bank*, 250 Minn. 539, 85 N.W.2d 668 (1957)). Teresa Small was a staff member, as was her mother, and she chose to leave her mother's car at the parking ramp because the parking ramp was open to the public and, as so pertinent here, particularly, to

---

1. "As a general rule, the possessor of land owes an invitee or business visitor the duty of exercising reasonable or ordinary care for the benefit of the invitee's safety, and the possessor is liable for the breach of such duty." *Mitchell*, 396 N.W.2d at 313 (citing *Stenholtz v. Modica*, 264 N.W.2d 514 (S.D.1978)). "This duty of reasonable and ordinary care requires keeping the property *reasonably safe* for the benefit of the invitee." *Mitchell*, 396 N.W.2d at 313 (emphasis in original) (citing Restatement (Second) of Torts § 343 comment b (1965)).

the employees of the hospital. One of the obvious purposes of the ramp was to provide ingress and egress to parking facilities for its employees.

Canary's deposition, *inter alia,* reflects his awareness of a state law which required that he assemble an adequate case history; purpose of same being to present adequate considerations to the Parole Board that it might determine if an inmate may safely be released to society or if continued confinement is required. Facts suggest that Canary failed to perform his statutory duty, under SDCL 24–15–1 and SDCL 24–15–2, in that the case history, which was prepared and sent to the Parole Board, was incomplete and inaccurate.[2] Succinctly, the Board was not apprised of Blair's violent tendencies.[3]

Concerning Parole Officer Kinder, he apparently met with Blair on one occasion for approximately five minutes on the day of Blair's release. Blair, if he can be believed, testified that a parole officer never checked on him. There are repeated suggestions, in the depositions, that Blair violated various admonitions in his parole plan and yet he neither was chastised nor found in violation of the conditions of his parole. Kinder was apparently unaware regarding Blair's employment status, and of Blair's operation of an automobile in direct contravention of

2. The Executive Director of the Board of Pardons and Paroles is statutorily directed to compile "an adequate case history" of each defendant, SDCL 24–15–1, and "shall ... [a]dopt and implement a procedure ... to contain the life history of each inmate" and "[e]nlist the services of any sheriff, state's attorney, circuit judge, or other officer who may have knowledge concerning each inmate, or circumstances surrounding the commission of the crime for which he was sentenced, or his previous history." SDCL 24–15–2. Canary's "cut file" supplied to the Parole Board did not include:

(1) Official Statement from Second Judicial Circuit regarding Blair's plea of guilty and subsequent sentencing for a 1976 robbery in the second degree. This statement contained a handwritten Addendum by Judge Braithwaite. It states: "I would be opposed to defendant being released in the minimum time. Unless he gets straightened out and some ability to earn money, he'll be in trouble as soon as he gets out. /s/ Braithwaite, Judge."
(2) A 1976 Report prepared by a Court Services Worker noting, *inter alia,* that Blair needed a "limiting and control[led] placement," had "exhausted all available placements within the juvenile system," and should be "handled as an adult."
(3) Official Statement from Second Judicial Circuit concerning Blair's 1977 attempted escape from jail and his accompanying damage to public property. A comment on the printed form under the heading "Disposition. Behavior While Awaiting Trial" reads: "attitude problem, all around troublemaker, agitator, fails to comply with orders." Judge Braithwaite commented that Blair was "cocky" and "immature."
(4) Official Statement from Second Judicial Circuit regarding charges of robbery in the first degree and kidnapping lodged against Blair in 1978 and his subsequent sentence of seven years for the robbery charge. A comment on the printed form under the heading "Disposition. Behavior While Awaiting Trial" reads: "Rocky has been a continued problem everytime he comes out of prison."

3. The majority states that it is unpersuaded by *Grimm v. Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977). I, however, find *Grimm* very persuasive. As the *Grimm* Court noted: "[T]he State Board of Pardons and Paroles owe a duty to individual members of the general public when the Board decides to release on parole a prisoner with a history of violent and dangerous conduct toward his or her fellow human beings. The standard of care owed, however, is that of *avoiding grossly negligent or reckless release of a highly dangerous prisoner." Id.,* 115 Ariz. at 267, 564 P.2d at 1234 (emphasis added). The Arizona Supreme Court added that "Board members voluntarily assumed responsibility for a highly dangerous person who could be paroled only by Board action. It is black letter tort law that while inaction is not normally a basis for liability, negligent performance of a duty voluntarily undertaken may be a basis for liability." *Grimm,* 115 Ariz. at 267, 564 P.2d at 1234. *See Ontiveros v. Borak,* 136 Ariz. 500, 509, 667 P.2d 200, 209 (1983). *See also* Note, 46 Fordham L.Rev. 1301 (1978) (in which a perceptive discussion of the *Grimm* case appears). Because Canary, the Executive Director of the Board of Pardons and Paroles, neglected to apprise the Parole Board of Blair's violent tendencies, the Board was deprived of a full picture of the man they subsequently released upon society. It is my belief that genuine issues of material fact exist as to whether Canary's error rose to the level of gross negligence or recklessness and I submit summary judgment was improperly granted. *See Aase v. State,* 400 N.W.2d 269, 271 (S.D.1987) (Henderson, J., dissenting) (where a discussion of the premature use of summary judgment appears). *See also Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968).

parole conditions. Neither did Kinder know, for he did not check, that Blair was to follow the rules of a certain "Glory House." During the argument of this case, before our Court at the State Capitol, one of the lawyers for the appellees made a startling statement that a monster was turned loose (Blair). I would add that this loosed monster was improperly supervised.[4]

It appears to me that the Board of Pardons and Paroles of this State undertook a statutory duty which it violated. It did not protect the public from a dangerous criminal and did not follow through, once it paroled Blair. Canary either knew, or should have known, that a person such as Rocky Blair was dangerous and likely to cause bodily harm to the general public if not properly controlled. His failure to fully inform the Parole Board of the character and tendencies of Rocky Blair was an obvious failure to perform his statutory duty. *See* SDCL §§ 24–15–1 and 24–15–2. Likewise, Kinder's failure to properly supervise Blair was a breach of his duty. *See* note 4 and accompanying text, *supra.* Surely, regarding both Canary and Kinder, questions of fact exist as to whether or not they were negligent in the performance of their respective duties. *See Grimm v. Arizona Bd. of Pardons & Paroles,* 115 Ariz. 260, 270, 564 P.2d 1227, 1237 (1977); Restatement (Second) of Torts § 319 (1965). *See also Aase v. State,* 400 N.W.2d 269, 271 (S.D.1987) (Henderson, J., dissenting) (noting that summary judgment is improper when genuine issues of material fact exist).

Furthermore, what does "maximum supervision" mean? If Blair, indeed, was placed on "maximum supervision status," there should have been a maximum amount of supervision. If Kinder was not "taking charge" of Blair, then who did have charge of him for and on behalf of the citizens of the State of South Dakota?

I steadfastly maintain that Blair's violent history, and turning him loose on the streets of Sioux Falls, carried with it a responsibility by public officials of this state to see that he was properly supervised. There is certainly a genuine issue of material fact as to whether these public officials violated their duty, lest a third person, like Teresa Small, an innocent young woman whose mission was simply to help her mother, could likely be the victim of bodily harm such as rape and murder. Indeed, had the public officials of this state exercised reasonable care, would Teresa Small be alive today? A jury in Minnehaha County should decide this and it should not be decided, on the strength of this record, by the trial court, in a fashion totally adverse to this deceased woman's interest and in favor of the governmental unit. Under SDCL 24–15–1.1, "[t]he prisoner remains an inmate under the legal custody of the department of charities and corrections until the expiration of his term of imprisonment."

In closing, I do not believe that either Kinder or Canary can escape the dictates of the Restatement (Second) of Torts § 319, at 129 (1965), which provides: "One who takes charge of a third person whom he knows or should know to be likely to

---

4. It is important to note that legal custody of a parolee remains in the warden of the penitentiary. SDCL 24–15–13. Upon release, a parolee is to be supervised by "officers and employees as may be necessary to accomplish the *proper supervision* of parolees...." SDCL 24–15–14 (emphasis supplied). Parole may be revoked if a parolee fails to abide by conditions of parole, fails to report to the correctional services office, refuses to answer inquiries made by the correctional services office, or if the purposes or objects of parole are not being met. SDCL 24–15–20. In this case, Blair, almost immediately upon his release from prison, violated conditions of his parole. Yet, Parole Officer Kinder's lax supervision resulted in Blair's numerous violations going unnoticed and unreported. Parole Officer Kinder had a duty to adequately supervise Blair's parole. *See Rieser v. District of Columbia,* 563 F.2d 462, 475 (D.C.Cir.1977) (en banc). "Potential liability for the negligent performance of these duties will not deter parole officers from performing them, but rather will encourage conscientious performance." *Id.* *See also* Note, 46 Fordham L.Rev. 1301 (1978) (where the author states that potential liability of public officers is part of a recent "notable trend to focus greater attention on the victims of crime.") *Id.*

cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." I would reverse the circuit court's grant of Summary Judgment as to Canary and Kinder and remand the entire case for trial.