Donovan SMALL, As the Special Administrator of the Estate of Teresa Small, Deceased, Plaintiff and Appellee,

v.

The McKENNAN HOSPITAL, Defendant and Appellant.

No. 16110.

Supreme Court of South Dakota.

Argued Jan. 10, 1989.

Decided March 8, 1989.

Rick Johnson of Johnson, Eklund & Davis, Gregory, Gregory A. Eiseland and Jon C. Sogn of Lynn, Jackson, Shultz & LeBrun, Rapid City, for plaintiff and appellee.

Harvey C. Jewett and Paul T. Barnett of Siegel, Barnett & Schutz, Rapid City, for defendant and appellant.

HERTZ, Circuit Judge.

## ACTION

On November 12, 1982, at approximately 7:30 p.m. Rocky Blair (Blair) abducted Teresa Small (Teresa) from the McKennan Hospital (McKennan) parking ramp, raped her twice and murdered her. Teresa's husband Donovan Small (Small), as special administrator of her estate, brought a negligence action against McKennan. In *Small v. McKennan Hospital*, 403 N.W.2d 410 (S.D. 1987), we reversed the trial court's grant of summary judgment and remanded the case for trial on whether under the "totality of the circumstances" McKennan could have foreseen the abduction, rape, and murder. McKennan now appeals from the verdict in favor of Small. We affirm.

## FACTS

Teresa and her mother Kathy Smith (Smith) were employed at McKennan. At approximately 7:15 p.m. on November 12, 1982, Teresa drove her mother's car to McKennan to return it to the parking ramp. Small followed Teresa in his car. Because of traffic and road conditions, Teresa was about one block ahead of Small when she turned into the parking ramp. At 7:30 p.m. Small parked his car west of the entrance/exit onto the parking ramp. He was parked there about five minutes

when a white Buick driven by a single male left the parking lot. The Buick stopped about a block down the street for a few minutes, made a U-turn and drove by Small.

Shortly thereafter, Small, concerned about miscommunications with Teresa, took the elevator to the third floor of the parking ramp. He observed Smith's car parked about 30 to 35 feet from the elevator doors. Since Teresa was not in the area, Small proceeded to check the stairwells and the elevator. He noticed a lot of cigarette butts in one area of the stairwell. There were human feces in one of the elevators. About this time Teresa's mother appeared and they both proceeded to look for Teresa. Small reached the fourth level of the parking ramp where he noticed four young men parked in a vehicle. He was near enough to observe that they were passing around a pipe of some type. He could smell marijuana. There was loud music emanating from their car radio. Small earlier had seen three young people sitting on the west side of the ramp. He noticed nothing unusual about their activity.

Small described the lighting in the parking ramp as "kind of yellowish, hazy, spooky light, real dim." The lights were recessed, creating shadows on the ramp. He continued to walk the various ramp levels until 8:30 p.m. when he decided to talk to security people at McKennan's front desk. During all of his search of the ramp area he never observed any security personnel. The receptionist at the front desk paged Willard Meyer (Meyer), who was in charge of security that night. Small advised Meyer that he could not locate his wife. They both proceeded to search further. Meyer advised Donovan to notify the police, who then joined the search and found Teresa's body.

McKennan is a large hospital located in a predominantly residential area in Sioux Falls, South Dakota. It covers approximately six square blocks and employs between 1,300 and 1,400 people.

McKennan's new four-story parking ramp opened in January of 1980. During construction, McKennan anticipated charging a fee for parking, so a guard booth was built at the point of entry/exit. An intercom system connected to the front desk was installed in the guard house. The guard house was never staffed because of budget considerations. McKennan employed one person each eight-hour shift to secure the hospital, its grounds, and the parking ramp.

The evidence reveals that there were problems in the ramp with vandalism and theft. Also, people were using the ramp to simply park, to drink alcoholic beverages, smoke marijuana, and generally to "party" because no one "bothered them there."

Rodney Heidenson (Heidenson) testified that on the night of November 12, 1982, he and Todd Steffens (Steffens) were on the McKennan ramp. Heidenson was sixteen years old at the time. They had arrived on the ramp between 6:30 and 7:00 p.m. to party, drink beer and smoke marijuana. They had been there "plenty" of times because nobody bothered them or ordered them to leave. They never at any time observed a security guard. Other kids went there for the same purpose, usually on Friday or Saturday nights.

On November 12 Heidenson and Steffens heard a scream. They looked around a little bit, returned to their car and left. They had been parked on the fourth ramp. Heidenson described the lighting as very poor, "You could barely see." They had to turn their headlights on. "The lighting was yucky yellow, yolk yellow. It was hard to see." Heidenson stated they never thought of reporting the scream because they had a case of beer in the back seat and they were getting "high."

Testimony revealed that Teresa and her mother never parked in the ramp area during night shifts because it wasn't lit well and it seemed safer to go out the emergency room exit. They were aware of McKennan's escort service but never used it because they always walked out in groups. Shannon Schultz, who lived four blocks from the main entrance to McKennan, testified that she had experienced a burglary at her house. She considered the neighbor-

hood unsafe and this was a strong reason for her moving from the area.

Blair testified that he had been released on parole eleven days prior to the death of Teresa Small. He owned a 1965 Buick automobile which, on November 12, 1982, he drove to McKennan approximately around ten or eleven o'clock a.m. He and a friend drank most of the day. That evening he parked on the ramp, drank whiskey and smoked marijuana. He had loud rock and roll music on his stereo. His car door or car window was open. He never saw a uniformed officer either on his first visit in the morning or that night.

Blair parked on the ramp for no particular reason except that it was "quiet, dark and lonely like." He did not recall how he chose Teresa as his victim. He did remember Teresa getting out of the car and proceeding toward the elevator. He grabbed her, put her in his car and drove out of the ramp. He was with her about an hour before he killed her.

Small called Charles A. Sennewald (Sennewald), a security consultant, as an expert witness. He testified that parking ramps are generally dangerous because of the many vehicles parked there. Parking ramps attract people who are looking to commit theft, vandalism and damage to vehicles.

In Sennewald's opinion there were at least four major areas where security controls were insufficient at McKennan. First, there was no access control in place in the McKennan ramp. Second, the recessed lighting failed to provide the necessary illumination of the parking ramp area. Third, there was no closed circuit television in use. Fourth, there was no systematic or routine or managed patrolling by the McKennan security staff. He opined that all of these factors contributed to the Teresa Small incident.

Sennewald indicated that the frequency of crime in Sioux Falls was 52 crimes for every one thousand people who lived in the city in 1982. The crime rate in South Dakota is one of the lowest in the United States. The average crime rate in South Dakota in 1982 was 26.4 crimes per one thousand residents. Crimes such as theft and vandalism can escalate into violent crimes, especially where the perpetrator is in danger of being apprehended. Further, if illegal activity is combined with alcohol and drugs, the risk of violence is inherently increased. Sennewald stated that in his opinion the security at the McKennan Hospital ramp was not adequate to protect the public against serious assault.

Howard Cone (Cone), McKennan's chief security officer, testified that each year from 1978 to 1982 he requested additional security personnel to better patrol the parking area, as well as surveillance cameras for the ramp area. Most of these requests were denied, and the number of security personnel decreased between 1981 and 1982. He admitted that there were problems with people using the ramp for parties and that there were problems with vandalism and theft. No incident reports were ever written up concerning the parties that persisted on the ramp, however. Security personnel were to visit the ramp area two or three times a night. Cone felt that the lighting was adequate in the ramp area.

In response to a "parking lot rapist" article appearing in the Sioux Falls Argus Leader, James G. Ward (Ward), assistant administrator in charge of security at McKennan, stated to a member of the media in 1980 that employees had been instructed about the danger, had been asked to report any unusual activity in or outside the building, and "We've been fortunate up to this point." He further testified that he had no personal apprehension of rape in the parking area but that "we were concerned." Ward testified that in his opinion the security measures and the lighting on the ramp were adequate on November 12, 1982.

Other testimony presented on behalf of McKennan indicated that the Sioux Falls Police Department considered the McKennan area as a low crime area. Ray Ricks (Ricks), McKennan's expert witness, testified that in his opinion the security measures at McKennan were reasonable and

prudent prior to the incident on November 12, 1982.

In *Small v. McKennan Hospital, supra,* this court refused to allow the lack of prior similar incidents to be determinative of foreseeability, opting instead for a "totality of the circumstances" test. This was the view adopted by the California Supreme Court in *Isaacs v. Huntington Memorial Hospital,* 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653 (1985). In *Isaacs,* the court declared that foreseeability must be analyzed in light of all the circumstances, recognizing that foreseeability depends on the facts in each individual case. Prior incidents, whether similar or not, were properly held to constitute evidence of foreseeability. Such incidents are helpful in establishing foreseeability, but not required to satisfy this element. In other words, such other incidents are not by themselves controlling in establishing foreseeability, but can be considered with all the other facts and circumstances relating to the issue.

The standard of "totality of circumstances" has been established as the law in this case. We now consider the various issues raised by this appeal.

## ISSUE I AND II

IS MCKENNAN ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE TERESA WAS NOT AN "INVITEE" AT THE TIME OF HER ABDUCTION?

DID THE TRIAL COURT ERR WHEN IT RULED AS A MATTER OF LAW THAT TERESA WAS AN "INVITEE" AND REFUSED TO PUT THAT ISSUE TO THE JURY, AND FURTHER REFUSED TO INSTRUCT THE JURY ON THE LICENSEE/INVITEE ISSUE PURSUANT TO A PROPOSED INSTRUCTION BY MCKENNAN?

We hold that trial court was correct in its ruling on these issues.

■ Initially, we find no merit in McKennan's claim that the verdict should be set aside because the proof at trial was to some extent at variance with the facts relied upon by this court in *Small v. McKennan, supra,* to review the propriety of the granting of McKennan's summary judgment motion. This court is unaware of any rule or case law that imposes such a requirement on Small. What is required is that the totality of the facts and circumstances demonstrate that a jury issue is created at the time of trial. In this case, Small succeeded in making such a showing.

■ There appear to be two essential elements required in the imposition of a duty to protect against unlawful acts: (1) the existence of a special relationship between the landowner and the injured party, and (2) a finding that the intentional criminal acts are foreseeable. Restatement (Second) of Torts, § 344 (1965).

■ The Restatement (Second) of Torts, § 332 (1965) defines an invitee as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land.

Here, Teresa qualified as a business visitor. She and her mother were employed by McKennan. After her work shift had been completed, Teresa's mother authorized Teresa to use her car to leave the workplace and to return the vehicle at the end of her mother's shift. Employees were encouraged to use the parking ramp facilities.

The comments to Restatement (Second) of Torts § 332 support this conclusion. Comment e provides, in part:

[A business visitor] includes those who come upon land not open to the public, for a purpose connected with business which the possessor conducts upon the land, or for a purpose connected with their own business which is connected

with any purpose, business or otherwise, for which the possessor uses the land.

Comment f provides, in part:

It is not necessary that the visitor's purpose be to enter into immediate business dealings with the possessor. The benefit to the possessor may be indirect and in the future. . . . It is not necessary that the particular visit shall offer the possibility of business dealings, or of benefit to the possessor. It is well enough that it has reasonable connection with another visit which does.

Comment g provides, in part:

It is not necessary that the visitor shall himself be upon the land for the purposes of the possessor's business. *The visit may be for the convenience or arise out of the necessities of others who are themselves upon the land for such a purpose.* (emphasis added).

In addition, in *Lesyk v. Park Avenue Hospital, Inc.*, 29 A.D.2d 1043, 289 N.Y.S.2d 873 (1968), a man provided transportation to a hospital for a friend to visit a patient. While waiting in the hospital parking lot for his friend to return the man fell and injured himself. Under the authority of § 332, Comment g, *supra,* the court held that he was a business visitor.

The cases cited by McKennan inapposite to this result are unpersuasive. Teresa was on the premises for the convenience and necessity of others (her mother), who was herself on the premises for the purpose of McKennan's business. Therefore, the trial court's determination that Teresa was an invitee on McKennan's premises will not be disturbed. Having so decided, we further determine that the trial court was correct in refusing to give McKennan's proposed instruction on the licensee issue.

## ISSUE III

WAS EVIDENCE INSUFFICIENT, AS A MATTER OF LAW, TO ESTABLISH THAT MCKENNAN OWED A DUTY TO TERESA, BASED UPON THE FORESEEABILITY OF SUCH CRIMINAL ACTIVITY?

■ The evidence at the trial clearly supports the trial court's decision to put the foreseeability issue to the jury.

McKennan operated a four-level parking ramp which was used by employees, patients and visitors twenty-four hours a day. The lighting in the parking ramp was described as "real eerie," "yellowish," "scary, spooky-like," "shadowy," "very poor," "yucky yellow," and "dark." The parking ramp, prior to the incident, was widely used by people of various ages for the purposes of "partying," consuming alcoholic beverages, and smoking marijuana. Incidents of theft and vandalism occurred at various times. People used the area because it was secluded and generally absent of security officials. McKennan was aware of the people using the area for parties. McKennan had warned its employees of the danger of sexual assault and admitted that it had been "very fortunate" that no assault had taken place in its ramp. On the very night of Teresa's assault and abduction, several groups of people were present, some of whom were engaging in drinking and smoking marijuana. Blair admitted he was on the ramp that night because it was "quiet and dark—lonely like." Blair spent from fifteen minutes to one-half hour on the ramp with loud rock and roll music blaring from his stereo, drinking whiskey and smoking two or three joints of marijuana. Despite the loud music, no security patrol was ever apparent to Blair or to the other young people on the ramp that evening. Prior to that night and on the night in question beer bottles and other trash littered various areas of the ramp. Someone had defecated in the parking ramp elevator that night.

McKennan was aware of the possibility of rape on parking ramps. It conducted rape awareness seminars, specifically warning its employees that 30 percent of all rapes begin or occur in parking lots. Escort services were provided in an attempt to minimize the danger of assaults. There was no control of any kind at the entry/exit area of the ramp despite the fact a guard booth had been put in place and an intercom system installed. The chief of security had requested in each of several years prior to the incident that more securi-

ty personnel be employed and that a television camera be installed. Most all of these requests were denied, ostensibly based on budgetary considerations.

While Ward admitted in 1980 that McKennan had been "very fortunate" that no assault had occurred in or on the parking ramp, it is clear that a long history of good fortune does not relieve a party from exercising ordinary and reasonable care in the operation of his particular business enterprise. Once the negligent conduct produces a foreseeable risk or injury, the actor may not find refuge in a "long history of good fortune." *Tanguma v. Yakima County*, 18 Wash.App. 555, 569 P.2d 1225 (1977); *Butler v. L. Sonneborn Sons, Inc.*, 296 F.2d 623 (2d Cir.1961).

In addition, Small's expert testified that parking areas are widely known as being inherently dangerous; that poor lighting contributes to criminal activity; that the unmonitored and frequency of security patrol on the ramp was totally inadequate; that the mixture of alcohol and/or drugs is bound to increase the risk of assaultive behavior; and that even though the crimes of theft and general vandalism are generally non-violent activities, violence can occur when individuals are confronted with the danger of being caught in the act.

There was testimony in behalf of McKennan which advised the jury that McKennan believes security measures and lighting conditions were adequate, and that McKennan had taken the necessary precautions against personal assaults. All of this was appropriately before the jury in its determination of the foreseeability issue.

Furthermore, in its very operation of a parking structure, defendant may be said to have created 'an especial temptation and opportunity for criminal misconduct,' thus increasing the foreseeability of the attack. (Prosser, Torts (4th ed. 1971) p. 174.) In making this observation we note the unique nature of a parking complex, which invites acts of theft and vandalism. In such structures, numerous tempting targets (car stereos, car contents, the cars themselves) are displayed for the thief; high walls, low ceilings and the absence of the cars' owners allow the thief or vandal to work in privacy and give him time to complete his task. Such circumstances increase the likelihood of criminal misconduct. In addition, the deserted, labyrinthine nature of these structures, especially at night, makes them likely places for robbers and rapists to lie in wait. Robbery, rape, and violent consequences to anyone who interrupts these crimes, may thus also be foreseeable.

*Gomez v. Ticor*, 145 Cal.App.3d 622, 193 Cal.Rptr. 600, 604 (2 Dist.1983); *see Isaacs, supra*, 211 Cal.Rptr. at 363, 695 P.2d at 660.

■ McKennan overly-emphasizes the lack of any kind of violent criminal activity on its premises. Failure to prove any criminal activity in the area is not fatal to the submission of the foreseeability issue to the jury, because criminal assaults occur in all neighborhoods, high call or low call. A violent criminal activity can be foreseeable simply upon common experience. *Dick v. Great South Bay Co.*, 106 Misc.2d 686, 435 N.Y.S.2d 240 (1981). *See also Mullins v. Pine Manor College*, 389 Mass. 47, 449 N.E.2d 331 (1983); *Sally G. v. Orange Glen Estates Homeowners*, 182 Cal.App.3d 789, 227 Cal.Rptr. 559 (4 Dist.1986).

Under the "totality of circumstances test" adopted by this court, the trial court acted properly in submitting the foreseeability issue to the jury.

### ISSUE IV

IS MCKENNAN ENTITLED TO A NEW TRIAL BECAUSE THE TRIAL COURT PREJUDICIALLY ERRED IN FAILING TO GIVE PROPOSED JURY INSTRUCTIONS 21, 22 AND 23 PERTAINING TO A SUPERSEDING, INTERVENING CAUSE WHICH, AS A MATTER OF LAW, PREVENTS IMPOSITION OF LIABILITY?

■ We hold the refusal to give McKennan's proposed instructions 21, 22 and 23 was correct under the facts and circumstances of this case.

McKennan relies upon Restatement (Second) of Torts § 448 (1965) which indicates that a criminal act can be a superseding cause of harm unless the criminal act was foreseeable. Restatement (Second) of Torts § 449 (1965) further states the rule:

> If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

This same issue was rejected by *Isaacs, supra,* and *Mullins v. Pine Manor College, supra,* 449 N.E.2d at 341:

> [Defendants] next argue that the judge should have ruled, as a matter of law, that the intervening criminal act of an unknown third person was a superseding cause which severed the chain of proximate causation. Our holding that the defendants had foreseen the risk of criminal attack largely disposes of the issue. The act of a third party does not excuse the first wrongdoer if such act was, or should have been, foreseen.

In this case, the jury was properly instructed on the issue of proximate cause, a proposed instruction offered by McKennan. It is identical to South Dakota Pattern Jury Instruction 15–01.

### ISSUE V

WAS IT PREJUDICIAL ERROR, NECESSITATING A NEW TRIAL, FOR THE TRIAL COURT TO SUBMIT JURY INSTRUCTION 16A, WHICH STATED THAT MCKENNAN OWED A DUTY TO TERESA, WITHOUT INCLUDING THE FORESEEABILITY REQUIREMENT OF CRIMINAL ACTIONS?

■ We hold that when the instructions to the jury are considered as a whole, the giving of instruction 16A does not rise to prejudicial error.

McKennan objects to the first paragraph of instruction 16A, which states: "McKennan Hospital owed plaintiff the duty to exercise ordinary care to keep the parking ramp reasonably safe for use by Teresa Small." We fail to see any merit to this objection. The trial court determined that Teresa was an invitee as a matter of law. We have agreed with that determination. Having done so, the trial court was then obliged to instruct the jury concerning the standard of care owed to an invitee. The fact that this statement precedes the foreseeability statement in the second paragraph is of no real consequence.

Instruction 16A coupled with other instructions clearly informs the jury that to find McKennan liable, it was required to find that it was reasonably foreseeable that criminal conduct on the part of third persons, either generally or at some particular time, would create a risk of harm to a person on the hospital grounds, and that if such criminal conduct was reasonably foreseeable, it must further find that McKennan failed to take the necessary precautions to prevent the risk of harm that a reasonably prudent person would have taken in the same or similar circumstances. We conclude that when the jury instructions are considered as a whole, as we have said many times they must be, no error can be predicated under this issue.

### ISSUE VI

WHETHER MCKENNAN IS ENTITLED TO A NEW TRIAL BECAUSE THE TRIAL COURT FAILED TO ALLOW EVIDENCE OF SECURITY MEASURES AT SIMILAR INSTITUTIONS IN SIMILAR COMMUNITIES?

■ We hold the trial court did not abuse its judicial discretion in denying this evidence.

In an offer of proof, McKennan indicated it was prepared to offer testimony that security at McKennan was better or the same as that in similar institutions in similar communities. The trial court excluded such evidence on the basis that its probative value was outweighed by the danger of unfair prejudice, and it had the possibility of misleading or confusing the jury. Additionally, the trial court denied some of

this evidence because of lack of foundation, and because the court did not want to open up mini trials on security measures at other facilities. It was also the trial court's view this kind of evidence did not establish the standard of care McKennan was required to meet.

While the trial court limited evidence of security measures at other facilities to whether or not they used a television camera, McKennan was permitted to cross examine Small's expert, Sennewald, regarding security measures at Sioux Valley Hospital and the V.A. Hospital in Sioux Falls. From this examination, the jury was advised that Sioux Valley Hospital and the V.A. Hospital did not have any security whatsoever: no security guards, no escort service, no closed circuit television cameras in the parking ramp area, and no access control to any parking areas.

We fail to see how McKennan was prejudiced in this regard. The trial court exercised its judicial discretion in limiting this kind of testimony under SDCL 19-12-3, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The trial court applied the balancing test required by SDCL 19-12-3. Its determination to limit such evidence to the immediate area was proper. Permitting additional testimony on security measures implemented at facilities all over this land would serve only to confuse and mislead the jury.

The proper standard of care is that degree of care which a reasonably prudent person would exercise under the same or similar circumstances. This standard of care was embodied in jury instruction 14A (South Dakota Pattern Jury Instruction 10–01.) It has been held that an industry cannot adopt careless methods in an effort to save time or money and then claim such methods set the standard of care for the purpose of determining negligence. *Edge-*

*water Motels, Inc. v. Gatzke,* 277 N.W.2d 11 (Minn.1979).

At a chambers hearing prior to Sennewald's testimony, counsel for McKennan conceded that security measures used by other facilities did not establish the proper standard of care McKennan was required to meet. Indeed, the *Isaacs* case, *supra,* teaches that each case must necessarily be determined on its own facts and circumstances. This is because the type of security is dependent on the type of construction being dealt with. Generally there are no two structures built the same. Lighting requirements differ with different types of construction. The number of security people patrolling the area will differ with the size of the structure, and the availability of closed circuit television cameras. The trial would be extended considerably if such evidence were permitted, since counsel would have to examine each facility through appropriate witnesses to establish similarity or dissimilarity. McKennan's expert was prepared to testify concerning security measures all over the land. It is too much to expect Small to counter such testimony. It is entirely too time-consuming, expensive and, more importantly, it does not represent the standard of care McKennan is required to meet.

We are satisfied the trial court did not abuse its discretion in limiting this type of evidence in this case.

ISSUE VII

IS MCKENNAN ENTITLED TO A NEW TRIAL ON THE BASIS THAT THE JURY'S VERDICT WAS CLEARLY EXCESSIVE IN NATURE, AND AFFECTED BY PASSION, SYMPATHY AND PREJUDICE?

We hold the verdict to be proper under all of the facts and circumstances in this case. McKennan is not entitled to a new trial under this issue.

■ The subject of damages is largely within the discretion of the jury. It will not be set aside unless the verdict is so excessive as to strike mankind, at first blush, as being beyond all measure, unrea-

sonable, and outrageous and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption. The fact that a verdict is extremely liberal is not grounds for a new trial. *Morey v. Keller,* 77 S.D. 49, 85 N.W.2d 57 (1957); *Weidner v. Lineback,* 82 S.D. 8, 140 N.W.2d 597 (1966); *Hotovec v. Howe,* 79 S.D. 337, 111 N.W.2d 748 (1961).

■ In this case, Dr. Ralph Brown, Small's expert economist, testified that the present value of economic loss to Small was $423,126.00. Economic loss, as testified to by Dr. Brown, has been approved by this court in *Martino v. Park Jefferson Racing Association,* 315 N.W.2d 309, 312 (S.D.1982); and *Flagtwet v. Smith,* 367 N.W.2d 188, 191, 192 (S.D.1985). This was a combination survival and wrongful death action. The jury was instructed that it could award damages for injuries, pain, suffering and mental anguish that Teresa suffered prior to her death. Additionally, the jury was instructed that Small was entitled to be compensated for the wrongful death of Teresa, excepting therefrom, damages for grief and mental anguish suffered by him because of Teresa's death. The jury ultimately returned a verdict for Small in the sum of $535,000.00.

We are satisfied from this record that the jury was properly instructed on the damage issue by the trial court under this issue.

Accordingly, we affirm the judgment of the trial court in all respects.

MORGAN and HENDERSON, JJ., concur.

WUEST, C.J., and MILLER, J., concur specially.

HERTZ, C.J., for SABERS, J., disqualified.

WUEST, Chief Justice (concurring specially).

I concur with the majority opinion. However, like Justice Miller, I would abolish the distinctions of trespasser, licensee and invitee as the controlling factor in determining the standard of care owed to an entrant by a land occupier for the same reasons stated in his special concurrence.

MILLER, Justice (concurring specially).

Although I generally agree with the majority opinion, I cannot embrace the discussion regarding invitees, public invitees, or business visitors or any general adoption of the Restatement on those topics. For all of the reasons stated in Chief Justice Wuest's [1] special concurrence in *Hofer v. Meyer,* 295 N.W.2d 333 (S.D.1980), I would abolish the distinctions of trespasser, licensee and invitee as the controlling factor in determining the standard of care owed to an entrant by a land occupier.

Further, I agree with the author's well-reasoned conclusion in Comment, *Premises Liability: A Proposal to Abrogate the Status Distinctions of "Trespasser," "Licensee" and "Invitee" as Determinative of a Land Occupier's Duty of Care Owed to an Entrant.* 33 S.D.L.Rev., 66, 89 where he states:

> The common law premises liability classification scheme, which graduates the duty of care owed by a land occupier to an entrant according to the entrant's status of 'trespasser,' 'licensee' or 'invitee,' has outlived its useful purpose. Changes in social mores, humanitarian values and societal living arrangements warrant abrogation in South Dakota of the traditional status distinctions as determinative of the scope of duty of care owed by occupiers to entrants and compel adoption of the more progressive and flexible standard of reasonable care under the circumstances. Were the South Dakota Supreme Court to undo what the common law courts have done poorly, South Dakota would stand to gain much. Land occupiers must be admitted to full membership in the fellowship of those acknowledging adherence to the neighbourly duty of reasonable care.

*See also* Comment, *The Business Inviter's Duty to Protect Invitees from Third-Party Criminal Attacks on the Premises: An*

1. At that time he was a circuit judge sitting for a disqualified justice.

*Overview and the Law in South Dakota After Small v. McKennan Hospital*, 33 S.D.L.Rev. 90.[2]

Our cases are outdated and antiquated, and like other jurisdictions we need to reexamine these issues in light of more modern times.

**2.** I strongly recommend a reading of these articles by anyone desiring a fine analysis of the topics presented.