**Daniel G. TIPTON, Conservator of the Estate of Crystal R. Tipton, a Minor; Daniel G. Tipton, Conservator of the Estate of Daniel E. Tipton, a Minor; Daniel G. Tipton, Individually, and Lisa M. Tipton, Plaintiffs and Appellants,**

v.

**TOWN OF TABOR, South Dakota and Bon Homme County, South Dakota and their Officers, Agents and Employees; N.L. Mach; Leonard Cimpl; Donald Fejfar; Donald Koranda; Alvin Sternhagen; Doris F. Muller; Eugene Sutera and Lyle O'Donnell, Defendants and Appellees.**

No. 18869.

Supreme Court of South Dakota.

Argued Feb. 13, 1995.

Reassigned July 12, 1995.

Decided Oct. 18, 1995.

Gerald L. Reade of Brady & Reade, Yankton, for plaintiffs and appellants.

John Simko and Tim R. Shattuck of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendants and appellees Town of Tabor, Mach, Cimpl, Fejfar, Koranda, Sternhagen, Muller and Sutera.

Douglas M. Deibert of Cadwell, Sanford & Deibert, Sioux Falls, for defendants and appellees Bon Homme County and O'Donnell.

MILLER, Chief Justice (on reassignment).

Daniel G. Tipton, his wife Lisa Tipton, and two of their children sued the Town of Tabor and Bon Homme County for damages incurred when one of the Tipton children was mauled by wolf-dog hybrids owned by a private individual. The circuit court granted summary judgment to the defendants on the

issue of liability. Tiptons appeal. We reverse and remand.

## FACTS

Kenneth Holland owned two hybrid wolf dogs and maintained them in an enclosed pen behind his house in a residential area of Tabor, South Dakota. It is undisputed that these animals were selectively bred in captivity and were ninety-five to ninety-six percent wolf, with the remainder being German Shepherd dog. Their cage rested solely on property owned by Holland.

On November 12, 1990, the Tipton family was visiting neighbors of Holland. Crystal Tipton, a four-year-old girl, wandered over to the pens. Crystal was not an invitee on the Holland property. No one observed how it happened, but Crystal was severely mauled by the two wolf dogs. It is unquestioned that Crystal suffered real and serious injuries. There were no known prior attacks by the animals. They were not known to run at large. The only prior complaints concerned their howling at night.

Holland did not have insurance to cover the injuries inflicted by his wolf dogs. He declared bankruptcy, and his liability for these injuries was therein discharged.

Tiptons sued the Town of Tabor (Town), Bon Homme County (County) and certain of their public officials on theories of negligence and nuisance. The defendants moved for summary judgment on the issue of liability. After a hearing before Circuit Judge Paul J. Kern,[1] the motions were granted on the grounds that these public entities owed no duty to Crystal Tipton. Tiptons appeal.

## ANALYSIS

■ Summary judgment shall be granted "... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15–6–56(c). On appeal, our task is to determine only whether a genuine issue of material fact exists and whether the law was correctly

applied. *Harn v. Continental Lumber Co.,* 506 N.W.2d 91, 94 (S.D.1993) (citing *Lamp v. First Nat. Bank of Garretson,* 496 N.W.2d 581 (S.D.1993); *Waddell v. Dewey County Bank,* 471 N.W.2d 591 (S.D.1991)). Whether a duty exists is a question of law for the court to determine. *See Schoenwald v. Farmers Co-op Ass'n of Marion,* 474 N.W.2d 519, 520 (S.D.1991).

Tiptons sued Town and County for negligently failing to investigate and abate a nuisance created by Holland's wolf hybrids. Tiptons also sued Town for the creation and maintenance of a nuisance.

To prevail under any of these theories, Tipton must first show that these government entities owed a duty to control or remove the animals owned by Holland, a private individual. *See* W. Page Keeton, Prosser & Keeton on Torts § 30 at 164–65 (5th ed. 1984) (noting an element of negligence is the existence of a duty); *Kryger v. Dokken,* 386 N.W.2d 481, 482 (S.D.1986) (stating "a nuisance involves an unlawful act or omission to perform a duty").

■ Generally, one owes no duty to control the conduct of third persons. *Cracraft v. City of St. Louis Park,* 279 N.W.2d 801, 804 (Minn.1979) (citing Restatement (Second) of Torts § 315 (1965)). However, when the government has enacted a statute or ordinance prohibiting particular conduct, the question arises whether the government may be liable for failing to take steps to ensure that third persons comply with the law. Under our case law, a government entity is liable for failure to enforce its laws only when it assumes a special, rather than a public, duty. *Hagen v. City of Sioux Falls,* 464 N.W.2d 396, 399 (S.D.1990). As we explained in *Hagen:*

> "[A] legislative enactment ... whose purpose is found to be exclusively (a) to protect the interests of the state or any subdivision of it as such, or (b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public," ... does not cre-

---

1. Judge Kern has since retired.

ate a standard of conduct to be used to impose tort liability.

*Id.* at 399 (citing Restatement (Second) of Torts § 288 (1965)). A special duty of care "arises only when there are additional indicia that the municipality has undertaken the responsibility of not only protecting itself, but also undertaken the responsibility of protecting a particular class of persons[.]" *Cracraft,* 279 N.W.2d at 806.

 Two laws concern us in this case. As to County, SDCL 7–12–29 provides in relevant part:

The sheriff may take possession of any animal suspected of being dangerous. The sheriff may hold such animal until a formal determination can be made of the extent of the danger such animal poses.... The sheriff may dispose of any animal so determined to be dangerous.

As to Town, the ordinance in effect at the time of the attack states:

No dog of fierce, dangerous or vicious propensities, licensed or not, shall be harbored or kept within the town.

Town of Tabor Ordinance § 8–1108.[2]

These laws present two related issues: (1) whether Town assumed a special duty to enforce its prohibition on dogs "of fierce, dangerous or vicious propensities" and (2) whether County assumed a special duty to "take possession of any animal suspected of being dangerous." *Hagen* sets forth a narrow interpretation of the public duty/special duty test; it permits recovery against a government entity for negligent failure to enforce its laws only when there is language in a statute or ordinance which shows an intent to protect a particular and circumscribed class of persons. Because the ordinance in effect at the time of the mauling identified no such class, the trial court found no special duty owed by Town to Crystal Tipton. The trial court similarly held that County owed no special duty to Crystal Tipton.[3]

---

**2.** Around the time of the attack, Town enacted a new animal control ordinance to replace this ordinance. The new ordinance states in part: "It shall be unlawful for any person to raise, keep or maintain, or permit to run at large, ... any wild animal or animals, within any area of the city which is platted into lots of an area of a size commensurate with customary and normal residence building sites or an area of less than one (1) acre, notwithstanding the fact that any such animals or poultry may be maintained in an enclosed area on private property." Town of Tabor Ordinance § 8–1101. Tiptons argue that the new ordinance imposes tort liability on the Town for failure to remove wild animals from the town. Town counters that the new ordinance was not effective until the day after the incident.

The trial court is duty bound to determine what law is applicable to the issues in any case. *Rosenberg v. Mosher,* 331 N.W.2d 79, 80–1 (S.D. 1983). What ordinance is in effect and controlling is always a question of law for the court to decide, even though its determination may require the court to find certain facts. 82 C.J.S. *Statutes,* § 79 (1953).

The effective date of an ordinance is controlled by SDCL 9–19–13, which provides that "every ... ordinance passed by the governing body shall take effect on the twentieth day after its publication. ...." Based on this provision, the effective date of the ordinance would be the day after the incident. However, an exception applies if the ordinance is "necessary for the immediate preservation of the public peace, health or safety." In that case, the ordinance takes effect upon passage. Tiptons argue that because the Town called a special meeting for the second

reading of the ordinance rather than waiting until a regularly scheduled meeting, the intent was to pass this measure as an emergency ordinance.

We reject Tiptons' claims. There is no emergency designation in the ordinance itself, nor is there an emergency designation in the minutes of the Town meeting. The purpose of the twenty-day delay is to allow the law to be challenged by referendum. SDCL 9–19–13. As with legislative enactments, the municipal governing body must affirmatively declare the existence of an emergency in order to take advantage of the exception allowing immediate enactment. *See, e.g., State v. Larson,* 81 S.D. 540, 544, 138 N.W.2d 1, 3 (1965). There is no declaration of such an emergency. The mere calling of a special meeting is not enough. Therefore, the new ordinance was not in effect at the time of the incident. We must focus our attention on the old ordinance.

As noted above, the old ordinance did not mention "wild animals," but rather dealt solely with dogs. Dogs were not allowed to run at large. Ordinance § 8–1104. Additionally, the ordinance proclaimed that "no dog of fierce, dangerous or vicious propensities, licensed or not, shall be harbored or kept within the town." Ordinance § 8–1108.

**3.** The record before us suggests the trial court did not consider SDCL 7–12–29 and its effect on the existence of a duty owed by County to Tiptons. We conclude the same analysis concerning Town's duty to enforce its animal control ordinance applies to County's duty to invoke SDCL 7–12–29.

We reject the bright-line test developed in *Hagen* and employed by the trial court in this case. Sole reliance on statutory language in determining whether a duty exists is needlessly restrictive and arbitrary. A statutory reference to a particular class of persons could very well be inadvertent rather than the result of any reasoned analysis of municipal or county responsibility. We require an analytical framework that more accurately measures a public entity's culpability for the harm suffered. Consequently, we adopt the approach embraced by the Minnesota Supreme Court. Whether the state, acting through city or county government, assumes to act for the protection of individuals should depend on at least four factors, including:

1) the state's actual knowledge of the dangerous condition;

2) reasonable reliance by persons on the state's representations and conduct;

3) an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and

4) failure by the state to use due care to avoid increasing the risk of harm.

*Cracraft,* 279 N.W.2d at 806–07. Strong evidence concerning any combination of these factors may be sufficient to impose liability on a government entity. *See Andrade v. Ellefson,* 375 N.W.2d 828, 836 (Minn.Ct.App. 1985).

Our new approach allows consideration of a broader range of relevant facts. Because the trial court focused its attention on statutory language alone, summary judgment in favor of Town and County was improvidently granted. For example, whether Town or County had actual knowledge of a dangerous condition created by the presence of the wolf hybrids is a subject of sharp dispute. Although Town and County were aware of the animals' presence in a residential area, government officials emphasize that the animals had not displayed any vicious tendencies prior to the attack and that no residents complained of safety concerns. Nevertheless, wolves are commonly known to have dangerous propensities. *See* 3 Fowler V. Harper et al., The Law of Torts § 14.11 at 271 (2nd ed.1986) (citing *Hays v. Miller,* 150 Ala. 621, 43 So. 818 (1907)); Webster's Third New International Dictionary, Unabridged 2628 (1971) (defining a wolf as "any of various large dog-like mammals of the genus *Canis* that are crafty, rapacious, and very destructive to game, sheep, and cattle and will sometimes attack man ..."). Russell J. Rutter & Douglas H. Pimlott, *The World of the Wolf* 170 (1968) (warning that wolves are wild animals, not conventional pets, and should be restricted to the few people who have an understanding of the animal).

The suggestion by Town that a four to five percent mix of German Shepherd would have diminished the animals' innate dangerous propensity is a claim that must be examined more fully on remand. Furthermore, the owner's treatment of the wolf dogs could be interpreted as proof that they were dangerous, wild animals. Evidence showed that Holland *never* released the animals from their pens. He also took extraordinary precautions to prevent their escape. In constructing the animals' pen, Holland used fence which was seven to eight feet tall, with an additional three feet of wire all the way around the pen. He installed wire under the surface of the ground, approximately four feet into the pen, so that the animals could not dig an escape hole along the edge of the pen. He also asked neighbors to refrain from visiting the pen unless he was present. In addition to having no yard fence, there was no exterior guard rail or secondary fence surrounding the cage that prevented visitors from coming into physical contact with the animals.

Some evidence suggests these extraordinary precautions were known to City's and County's officials. Both City's police chief and County's sheriff had viewed the pens. The police chief said the animals "kind of looked like wolves" and "to me it was like a dog that looked like a wolf." In his report of the mauling, the sheriff repeatedly referred to the animals as "wolves." Indeed, evidentiary photographs of the hybrids depict animals that strongly resemble wolves in appearance. *See* Webster's Third New International Dictionary, Unabridged 2628–29 (1971) (describing wolves as "yellowish or

brownish gray with rather coarse fur, erect pointed ears, and a bushy tail"); L. David Mech, *The Wolf: The Ecology and Behavior of an Endangered Species*, 26 (1970). In spite of this elaborate fencing and the animals' resemblance to wolves, neither the police chief or sheriff ever questioned or cautioned Holland prior to the attack, except to ask that he try to keep the animals from howling.

Similarly, Town's finance officer licensed the animals. The license form designates the animals as "wolf hybrids." At the time of licensing, the finance officer required proof of vaccination, and the veterinarian's vaccination slip identifies the animals as "wolves," while referring to three other canines owned by Holland as "dogs." The finance officer informed Town's trustees of her decision to license the wolf hybrids. In light of the animals' genetic contribution from wolves, their marked resemblance to wolves, the extraordinary precautions taken in caging them, and their constant confinement, Town or County may have had actual knowledge of the dangerous propensities of Holland's wolf hybrids. Additionally, Town licensed the animals, which may or may not have increased the likelihood they would harm others. Having relied on our narrower test in *Hagen*, the trial court did not review these and other relevant facts.

We reverse and remand for further consideration by the trial court in light of our revised public duty/special duty test.

SABERS and KONENKAMP, JJ., concur.

ERICKSON, Circuit Judge, concurs in part and dissents in part.

ERICKSON, Circuit Judge, sitting for AMUNDSON, J., disqualified.

GILBERTSON, J., not having been a member of the Court at the time this case was submitted did not participate.

ERICKSON, Circuit Judge (concurring in part and dissenting in part).

I concur as to the broadening of the test to determine public duty liability. I dissent as to the result. I do not believe that summary judgment was improvidently granted under these circumstances. Whether utilizing the bright-line test adopted in *Hagen v. City of Sioux Falls*, 464 N.W.2d 396, 399 (S.D.1990), or the broader test now set forth in this opinion, Tiptons have not shown that either the town or the county assumed a special, rather than public duty.

Tiptons set forth their evidence and arguments concerning the *Cracraft* factors for the trial court's consideration. *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn. 1979). The trial court, without specifying which test it utilized, granted summary judgment. We assume that the prevailing law was followed and the bright-line test of *Hagen* was used. However, we have had the opportunity to review both the evidence and the arguments concerning the *Cracraft* factors. There is no need for additional hearings.

The majority concedes that the ordinance and state law do not contain language which would create a special duty. In reviewing the evidence, it is clear that no one relied upon any representations or conduct by these public officials.

Instead, the majority argues that there is a material issue as to these public officials' actual knowledge of a dangerous condition created by the presence of these *wolf-dog hybrids*. In order to prove actual knowledge on the part of these public officials, this Court has had to take judicial notice that *wolves* are commonly known[1] to have dangerous propensities. This Court, as well as the trial court, certainly has the authority to take judicial notice of certain facts "not subject to reasonable dispute." SDCL 19–10–2.

The majority is taking judicial notice of a general character trait, or reputation, *not* of an individual animal, but rather an entire

---

1. "Common knowledge" is defined in Black's Law Dictionary, 6th Edition (1990), p. 276 as: Refers to what court may declare applicable to action without necessity of proof. It is knowl-edge that every intelligent person has, and includes matters of learning, experience, history and facts of which judicial notice may be taken.... *See also* Judicial notice.

species of animal. Beyond that, the majority is saying not only is the entire species dangerous, but any hybrid of that species should be considered dangerous. I respectfully suggest that is too big a leap.

The gist of my dissent is this. We should *not* take judicial notice of a fact which is subject to considerable debate and whose source and accuracy cannot be determined. SDCL 19–10–2(2).

We are dealing with character or reputation evidence. I believe it was the late Professor Irving Younger who commented that character or reputation evidence is probably the weakest and least persuasive type of evidence available to the trial lawyer. Typically, when this type of evidence is offered, it is applied to an individual, rather than a group. I am uncomfortable applying a general character trait, or reputation to a group, even if it is merely a member of the dog family.

Additionally, "common knowledge" is an elusive thing. What might be "common knowledge" to the zoologist, may not be "common knowledge" to a street-cop or city auditor. I believe that to be the case in this instance. Where is the strong evidence that these public officials knew or should have known that wolves, and by genetic association, all wolf-dog hybrids are per se dangerous? A careful review of the evidence submitted to the trial court, and reviewed by this Court reveals that Tiptons' evidence on this issue consisted of the trial lawyer's personal opinion, as opposed to expert or lay opinion, treatise evidence, or factual evidence.

Now, this Court takes judicial notice of what it terms "common knowledge" of the wolf species' propensity to be dangerous. But before doing so, we should examine this generalized character trait evidence and its source.

As we have struggled with this case, some of the information we reviewed discussed the history of the wolf. This issue concerning the wolf's propensity for aggression is hotly debated. Talk to a western rancher and the wolf most likely has the common reputation of a vicious, carnivorous beast, to be shot on sight. Yet, zoologists and others take the view that wolves are more wary towards humans than they are dangerous.[2] Alderton, David, *Dogs,* Dorling Kindersley, New York, NY, (1993) p. 10. They currently are protected by Congress as an endangered species. 43 Federal Register 9612; March 9, 1978. The U.S. Fish & Wildlife Service reports indicate that "[t]here have been no known gray wolf attacks on humans in modern times in North America." U.S. Fish & Wildlife Service: U.S. Government Printing Office: 1974, Publication # 576–782.

In our reading, the literature points out that much of our fear of wolves comes from fable, myth and oral tradition.

Fear of real wolves occasionally bordered on hysteria. Wolves did kill travelers and they did occasionally transmit a terrible disease, always fatal, for which there was no cure: rabies. The wolf threatened a peasant's spiritual world by exhuming bodies, and hungry wolves standing in stark tableaus on piles of the dead during the Black Plague were a chilling reminder of what little separated peasants from a life of scavenging.

Lopez, Barry, *Of Wolves and Men,* Charles Schribner's Sons, New York, N.Y. (1978), p. 208.

George Washington once noted that both "feral dogs" and wolves "retarded the growth of the sheep industry." *Ibid,* p. 172. Yet, colonists of that time ascribed almost all canine attacks to the wolf. Why? Because the wolf, not the dog, "wore the cloak of evil and few could tell the difference between their tracks." *Ibid,* p. 173.

It can be precarious to confuse public perception with fact, particularly when that perception is based in part on myth, fable and

---

**2.** Grolier's Multimedia Encyclopedia, 1995 reports that:

Although the wolf is still cast as a blood thirsty villain in folklore and children's stories, the public image of the wolf is improving; ....

Several scientific studies have disclosed the wolf's role in natural ecosystems and have done away with some of the misconceptions that have surrounded this colorful and complex animal for centuries.

oral tradition. I believe that to be the case in this instance.

I am not here to defend either the wolf or these wolf-dog hybrids.[3] But, the fact is, that whether before the trial court, or this Court, Tiptons were unable to produce expert or lay opinion evidence, treatise evidence, or factual evidence that *wolf-dog hybrids* have a commonly held, and accepted reputation for viciousness.

Additionally, it is not as if the public officials did nothing. They were concerned about the presence of wild animals in the town limits. Inspections were made of the cages prior to the incident, and as conceded by the majority, the animals were found to be well-caged. Further, the public officials found that there was no history of the animals running-at-large. There was no history of prior vicious behavior. The city attorney was consulted and the existing ordinance reviewed. As a result, a new ordinance was drafted and presented for enactment which would have prohibited the presence of "wild" animals. What else would the majority have them do? Under all of the circumstances, these public officials acted reasonably, weighing the safety of the public with the personal property rights of the animals' owner.

The bottom line is that there is no need for the expense of additional hearings. We have the evidence before us which allows us to make this decision. It is clear that it is *not* "common knowledge" to a county sheriff, chief of police or city auditor that *wolf-dog hybrids* are per se dangerous.

I would affirm the trial court.

---

**3.** I concede these are wild animals. Neither state law nor the Town ordinance prohibited the owning of wild animals. But wild is not synonymous with inherently dangerous. Further, I believe it incumbent that owners of wild animals must take special care in their handling. I disagree however, in establishing the principle that knowledge of the existence of a wild animal within a community, even though well-caged, imputes actual knowledge of a dangerous condition to all public officials.