1998 SD 78

**Melissa WALTHER, Plaintiff and Appellant,**

v.

**KPKA MEADOWLANDS LIMITED PARTNERSHIP, a District of Columbia limited partnership; KP Realty Holdings, Inc., a New York corporation; Lloyd's Component, Inc., a Minnesota corporation; Norman Altman, general partner in KPKA Meadowlands Limited Partnership; Dimension Management, Inc., a South Dakota corporation; City Of Sioux Falls, S.D., a municipality; Frank Arnett, individually and in his official capacity; John and Jane Does in their individual and official capacity, Defendants and Appellees.**

Nos. 20204, 20222, 20227 and 20229.

Supreme Court of South Dakota.

Argued April 28, 1998.

Decided July 15, 1998.

---

528

Robert L. Morris and Michael C. Loos of Quinn, Eiseland, Day & Barker, Belle Fourche, and Jeanne Kelly, Sioux Falls, for plaintiff and appellant.

Richard J. Helsper of Helsper and Rasmussen, Brookings, for appellees KPKA Meadowlands, KP Realty Holdings, Lloyd's Component and Altman.

Gary J. Pashby and Lisa Hansen Marso of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for appellee Dimension Management.

Gary P. Thimsen and Melanie L. Carpenter of Woods, Fuller, Shultz & Smith, Sioux Falls, for appellee Frank Arnett.

R. Shawn Tornow, Chief Assistant City Attorney, Sioux Falls, for appellees City of Sioux Falls and John and Jane Does.

MILLER, Chief Justice.

[¶ 1.] Melissa Walther was viciously raped and stabbed by her former boyfriend Ricky Sieler, who is currently serving a lengthy prison term for rape and attempted murder. She subsequently filed a lawsuit against the City of Sioux Falls and Police Officer Frank Arnett, alleging negligence and violations of 42 U.S.C. § 1983. She also alleged negligence and breach of the implied warranty of habitability against the owners and managers of her apartment building. The trial court granted summary judgment to the owners and managers of the apartment building. It granted summary judgment to City and Officer Arnett on some of Walther's claims, but denied them summary judgment on her claim that they were negligent in not seeking immediate medical treatment for her. All the parties appeal and we affirm.

## FACTS

[¶ 2.] Walther began a relationship with Sieler in October, 1988. The couple parented a child who was born in February of 1992. Although never married, they lived together for about a year prior to June, 1993. Sieler was abusive to Walther on various occasions and the Sioux Falls Police Department was called to respond to some of these assaults.

[¶ 3.] On June 23, 1994, Walther was at work when she received a phone call from Sieler. The two argued. When she was finished with work, she returned home (at approximately 3:15 a.m., on June 24). Sieler had followed her and, after she had parked her car (but remained seated therein), he confronted her and grabbed her car keys from her. He pulled her out of the car, but she was able to run to a nearby convenience store. As she tried to call for help, he ripped the phone out of her hands. She then ran back towards the apartment complex. Finally, a neighbor who had seen Sieler chasing her, was able to wrestle Sieler to the ground and retrieve Walther's car keys. Walther then drove away.

[¶ 4.] The police eventually arrived on the scene and were informed that Walther and Sieler had argued and Sieler had left driving a black pickup. The police later observed the pickup traveling at a high rate of speed, almost colliding with a parked vehicle, so they pulled it over. Sieler failed some field sobriety tests and was placed under arrest for DUI. A subsequent intoxilyzer test indicated he had a blood alcohol level of 0.134 percent. He was then charged with a first-offense DUI.

[¶ 5.] Meanwhile, one of the officers had remained at the scene of the arrest waiting for a tow truck to pick up Sieler's vehicle. Walther stopped to talk to the officer. When he asked Walther if Sieler had assaulted her, she responded "no." Walther then went home and went to bed with several windows left open in her apartment.

[¶ 6.] Sieler posted bond to get out of jail and was given some of his keys upon re-

lease.[1] He went home, got his motorcycle and drove to Walther's apartment. This was about 5:00 a.m., less than two hours after he first attacked Walther in the parking lot. Sieler knocked on Walther's apartment door and rang the doorbell. When she did not answer, he went outside, climbed up on a guard rail, and proceeded to enter the apartment through an open window.

[¶ 7.] Walther, upon hearing a commotion in her living room, went to investigate and saw Sieler standing there. The two argued. Walther then went back to bed. A short time later, Sieler went into the bedroom and raped her. Walther then proceeded to the living room where Sieler joined her a short time later and again argued with her. He then went back into the bedroom and called her to return, where he viciously cut her throat and stabbed her several times. He then also cut himself.

[¶ 8.] Later in the morning, one of Walther's neighbors noticed blood in the hallway and called the police. Officer Frank Arnett was sent to investigate. The neighbor told Arnett that the blood may be Walther's. Arnett attempted to phone Walther, and when no one answered, he obtained a pass key to the apartment and opened the door.

[¶ 9.] Upon stepping into the doorway he saw Walther lying on the floor. He then shut the door to secure the crime scene and phoned for backup, reporting the incident as a homicide. When asked if he wanted medical personnel from the fire department dispatched while he waited, he responded "no." After the backup officers arrived they entered the apartment, found both Walther and Sieler and determined they were still alive. Officer Arnett then called for medical assistance. This was approximately eighteen minutes after he had first discovered Walther. Both parties survived their wounds and Sieler is currently serving 120 years in the South Dakota State Penitentiary for the kidnapping, rape, and attempted murder of Walther.

[¶ 10.] On June 27, 1995, Walther filed suit against KPKA Meadowlands L.P., which

---

1. Sieler was told that he could not get his car keys until after he sobered up. He was, however, given the key to his motorcycle because he had expressed concern over how he would get to work later that morning.

owns the apartment complex, and Dimension Management, Inc., which is responsible for its management. She alleged negligence and breach of the implied warranty of habitability. She also filed suit against City and Officer Arnett, alleging negligence and violations of 42 U.S.C. § 1983.[2]

[¶ 11.] All defendants moved for summary judgment. Summary judgment was granted to KPKA and Dimension. Partial summary judgment was also granted to City and Officer Arnett on Walther's claim under 42 U.S.C. § 1983, and on her allegation that City was negligent in failing to arrest Sieler for domestic abuse. However, summary judgment was denied on the claim that City and Officer Arnett were negligent in not providing immediate medical care to Walther.

[¶ 12.] On appeal, Walther argues:
1. The trial court erred in granting summary judgment to City.
2. The trial court erred in granting summary judgment in favor of KPKA and Dimension.

[¶ 13.] City and Officer Arnett assert:
3. The trial court erred in not granting summary judgment in their favor.[3]

## STANDARD OF REVIEW

[¶ 14.] Our standard of review for summary judgment is well established:

"In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The non-

moving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper."

*Specialty Mills, Inc. v. Citizens State Bank,* 1997 SD 7, ¶ 7, 558 N.W.2d 617, 620 (citing *Lamp v. First Nat'l Bank of Garretson,* 496 N.W.2d 581, 583 (S.D.1993)).

## DECISION

[¶ 15.] 1. **The trial court did not err in granting summary judgment to City.**

[¶ 16.] Walther claims the trial court erred in granting summary judgment to City on her allegation of negligent failure to arrest Sieler for domestic abuse. Specifically, she claims that had Sieler been arrested for domestic abuse he would not have been able to immediately bond out of jail. The trial court concluded the police department owed no duty to Walther because probable cause did not exist to arrest Sieler for domestic abuse. We agree.

[¶ 17.] Generally, the law imposes no duty to prevent the misconduct of a third person. *Gleason v. Peters,* 1997 SD 102, ¶ 8, 568 N.W.2d 482, 484; *Tipton v. Town of Tabor,* 1997 SD 96, ¶ 12, 567 N.W.2d 351, 357 (*Tipton II* ). Thus, police officers are generally protected from liability through what is termed the public-duty rule. The rule provides that the police owe a duty to the public at large and not to an individual or smaller class of individuals. This rule has received much recent attention from this Court. *See*

---

2. Specifically, Walther's third cause of action alleged that City was negligent for failing to arrest Sieler for domestic abuse. Her fourth cause of action alleged that City and Officer Arnett were negligent in providing medical care to her. Her fifth cause of action alleged that City was negligent in returning Sieler's motorcycle keys to him after he was released from jail. Her sixth, seventh, and eighth causes of action involved allegations of various violations of 42 U.S.C. § 1983. Walther later voluntarily dis-

missed her fifth, sixth, and seventh causes of action.

3. KPKA and Dimension also argue on appeal that they are entitled to summary judgment because Walther's actions are barred by the doctrines of contributory negligence and assumption of the risk. The trial court did not reach those issues and, because we affirm on other grounds, neither do we.

*Gleason; Tipton II; Tipton v. Town of Tabor,* 538 N.W.2d 783 (S.D.1995) (*Tipton I* ).

[¶ 18.] In the cases cited above, we have also recognized the special-duty exception to the public-duty rule. That exception recognizes that there may be some situations where it is found a duty is owed to a particular class of persons separate from that owed to the general public. In *Tipton I,* we adopted a four-part test to analyze whether a case is taken out of the realm of the public-duty rule based on the existence of a special duty. The four factors to be examined are:

1. [T]he state's actual knowledge of the dangerous condition;

2. reasonable reliance by persons on the state's representations and conduct;

3. an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and

4. failure by the state to use due care to avoid increasing the risk of harm.

*Tipton I,* 538 N.W.2d at 787. "Strong evidence concerning any combination of these factors may be sufficient to impose liability on a government entity." *Id.* We will examine the four factors in turn.

### a. Actual knowledge

[¶ 19.] We have defined "actual knowledge" as "knowledge of a violation of law constituting a dangerous condition. Constructive knowledge is insufficient: a public entity must be uniquely aware of the particular danger or risk to which a plaintiff is exposed. It means knowing inaction could lead to harm." *Gleason,* 1997 SD 102, ¶ 16, 568 N.W.2d at 486 (citing *Tipton II,* 1997

SD 96, ¶ 17, 567 N.W.2d at 358) (internal quotations omitted). " '[A]ctual knowledge denotes a foreseeable plaintiff with a foreseeable injury.' " *Id.* "[A]ctual knowledge imports 'knowing' rather than 'reason for knowing.' " *Tipton II,* 1997 SD 96, ¶ 18, 567 N.W.2d at 359.

[¶ 20.] Walther claims there were many facts known to the police officers that should have indicated to them that she was a foreseeable plaintiff with a foreseeable injury. She points out that they responded to a call in regard to a family dispute.[4] They were also informed that Sieler was chasing Walther and that he had a "mad dog" look in his eyes. There was even testimony from Tony Faulks (the neighbor who wrestled Sieler to the ground to help Walther) that he told the officers how Sieler physically pulled Walther from the car, and that he feared for her safety.[5] The officers were also informed that Sieler took off at a high rate of speed in his pickup to apparently continue chasing Walther.

[¶ 21.] There is also much evidence of numerous past disputes involving Walther and Sieler to which the police were called. These earlier incidents, if found to be true, are evidence that could bolster the foreseeability element of determining actual knowledge.[6] If the officers were aware of the violent history between Walther and Sieler, it could make the incident on June 24, 1994, much more foreseeable in light of what they knew.

[¶ 22.] Walther testified that she told one of the officers how Sieler had pulled her out of her car. Significantly, however, Walther also told that officer that she *had not been assaulted* and that she *did not want to seek a protection order.*

4. Walther's neighbor, Wanda Faulks, testified that she made the call to the police and informed them that Sieler was trying to hurt Walther and that he was also driving drunk.

5. Tony Faulks also stated in his deposition that the officer he reported this to never wrote down anything that Faulks told him.

6. On July 4, 1992, Sieler was arrested on an assault charge for punching Walther in the face and repeatedly slamming her head into the bathroom floor. Officer Tupper, one of the officers involved in arresting Sieler for DUI on June 24, 1994, was involved in the arrest of Sieler in

1992. There is also a long list of other instances where the police were dispatched to Walther's apartment between the 1992 attack by Sieler and the one in June of 1994. Many of these incidents involved family disputes with Sieler, assaults by Sieler, and intoxication by Sieler. On May 8, 1994, less than a month before this incident, the police were sent to Walther's apartment concerning Sieler. He was apparently intoxicated and threatened to kill Walther if she went ahead with her plans to get a protection order against him. Sieler was arrested for assault based on this incident.

[¶ 23.] Actual knowledge may not be established through speculation. *Tipton II*, 1997 SD 96, ¶ 18, 567 N.W.2d at 359 (citation omitted). It must be established that the officers "must have known" rather than "should have known" that Sieler would later attack Walther. *See id.* Having told the officers she was not assaulted and did not want a protection order, it is difficult to conceive how the officers could have foreseen the attack that occurred later. Walther would have to convince a jury that the police were aware of the unique facts in this case, knew Sieler's violent history, and knew that an attack of this sort was foreseeable. This is a stretch, but even assuming that Walther can establish the actual knowledge factor, that alone is not enough to establish a special duty. *See id.*, 1997 SD 96, ¶ 29, 567 N.W.2d at 364. Walther must couple the actual knowledge factor with at least one of the other factors in order to establish a special duty. *Id.*

### b. Reasonable reliance

[¶ 24.] The next factor to be analyzed is that of reasonable reliance. "Reliance must be based on personal assurances." *Tipton II*, 1997 SD 96, ¶ 32, 567 N.W.2d at 365. In *Tipton II*, we held there was not reasonable reliance by the plaintiff because no direct promises were made. *Id.*

[¶ 25.] Walther relies on the fact that she knew Sieler was arrested for DUI as creating some sort of implicit assurance that he would not be permitted to later return to her apartment. Such an implicit assurance is not enough. Here, the police did not make any representations or promises to Walther concerning Sieler. She was merely informed that he had been arrested for DUI. There was never any indication how long he would be kept in jail. In fact, Walther's own testimony was that she knew he could be released from jail that same night based on a DUI arrest.

[¶ 26.] Walther also relies on our statement in *Tipton II* that "[v]ictims of domestic violence who have obtained protection orders may fit" within the reasonable reliance category. *Id.*, ¶ 33, 567 N.W.2d at 365 n. 22. Walther did not have a protection

order against Sieler, although, at an earlier time she had tried to obtain one. When Sieler became aware of that, he attacked her and threatened her life. He was arrested for assault and his preliminary hearing was held eleven days before the current incident. Because Walther became a reluctant witness, Sieler was ultimately bound over on a lesser charge of disorderly conduct. He was then released on a personal recognizance bond and the judge instructed him to have no contact with Walther unless it was to pick up or drop off their child. Walther claims this oral instruction created some sort of reliance on the system in general and is similar to cases involving protection orders.

[¶ 27.] We do not agree that the instruction from the judge created in Walther a reasonable reliance that the police officers owed her a special duty. In *Tipton II*, we cited the New York case of *Sorichetti v. City of New York*, 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70 (1985), wherein it was held a protection order could create reasonable reliance and a special duty. *Id.* 492 N.Y.S.2d 591, 482 N.E.2d at 76. What was critical in *Sorichetti* was the police were shown the protection order and thus knew of the dangerous tendencies of an individual, and they also reassured the victim's mother that they would take care of the problem. *Id.*

[¶ 28.] This case is clearly different from *Sorichetti*. Walther did not have a protection order. There was even testimony that the officers checked to see if there was one. Also, she can point to no personal assurances from the police that she would be protected. A general statement that she somehow relied on the system is not enough. Walther has failed to demonstrate there was reasonable reliance, but that does not end our inquiry.

### c. Statute for protection of a particular class

[¶ 29.] This factor "permits recovery against a government entity for negligent failure to enforce its laws only when there is language in a statute or ordinance which shows an intent to protect a particular and circumscribed class of persons." *Tipton I*, 538 N.W.2d at 786. Walther claims that SDCL 23A–3–2.1 is such a statute. At the

time of this incident, that statute provided, in relevant part:

> A law enforcement officer *shall* arrest and take into custody, pending release on bail, personal recognizance, or court order, a person, without a warrant, *if the officer has probable cause to believe that:*
>
> \* \* \* \* \* \*
>
> (2) The person is eighteen years or older and within the preceding four hours has assaulted that person's spouse, former spouse, or a person eighteen years or older with whom the person resides *or has formerly resided* and the officer believes:
>
> \* \* \* \* \* \*
>
> (c) An attempt by physical menace has been made to put another in fear of imminent serious bodily harm.

(Emphasis added.) [7]

[¶ 30.] While this statute contains language that specifically mentions a particular class of persons, such language is not dispositive of this issue. *See Tipton I*, 538 N.W.2d at 787. "We require an analytical framework that more accurately measures a public entity's culpability for the harm suffered." *Id.*

[¶ 31.] In *Tipton II*, we examined two statutes under this factor to determine if either delineated a particular class to be protected or created a mandatory obligation. 1997 SD 96, ¶ 36, 567 N.W.2d at 366. SDCL 23A–3–2.1 is a statute that has been created to protect a particular class of persons: Victims of domestic abuse. It seems clear that, given the critical nature of domestic abuse cases, the legislature has enacted this statute to allow for warrantless arrests to protect the victims. However, in order for SDCL 23A–3–2.1 to create a mandatory obligation, certain statutory requirements must be met. Among other things, in order to make a valid warrantless arrest, an officer must have

probable cause to believe that a person, eighteen years or older, has assaulted another with whom he or she has formerly resided. The trial court determined that probable cause to arrest did not exist and Walther claims this determination was incorrect.

[¶ 32.] Usually, we are asked to review a probable cause determination in the criminal procedure context as to whether an officer made the proper determination that probable cause did exist. *See State v. Johnson*, 509 N.W.2d 681 (S.D.1993); *State v. Krebs*, 504 N.W.2d 580 (S.D.1993); *State v. Baysinger*, 470 N.W.2d 840 (S.D.1991); *State v. Zachodni*, 466 N.W.2d 624 (S.D.1991). This situation is different because we are asked to decide, in a civil context, whether the officers erred in determining that probable cause did not exist. We have stated that "[p]robable cause for arrest exists where facts and circumstances within a police officer's knowledge of which he has reasonable trustworthy information 'are sufficient in themselves to warrant a belief by a man of reasonable caution that a crime has been ... committed.'" *State v. Oyen*, 286 N.W.2d 317, 318–19 (S.D.1979).

[¶ 33.] We agree with the trial court's determination that probable cause to arrest Sieler under SDCL 23A–3–2.1 did not exist. The officers specifically asked Walther if she had been assaulted and she said she had not. Also, according to the statute, the officers must have probable cause to believe that the persons involved are spouses, former spouses, or that they reside together or formerly resided together. The only category applicable to this case is that Walther and Sieler had formerly resided together. However, Walther is unable to point to any evidence in the record which indicates the officers were aware that she and Sieler previously lived together.[8] Clearly, there was no probable

---

7. This statute was amended in 1996 to expand the class of persons protected to include persons with whom an abuser has a child. This amended version does not apply in this case as it was enacted after Sieler attacked Walther, however, since Walther and Sieler had "formerly resided" together, the statute may still be applicable.

8. Officer Tupper, who was involved with the arrest of Sieler in this case, also was involved

with another arrest of Sieler for abusing Walther. However, this occurred before Walther and Sieler began living together, and there is no indication that Officer Tupper was ever aware the two later resided together. Also, the alleged attack in this case took place in the parking lot outside of Walther's apartment and both she and Sieler drove away in separate cars. Thus, there ap-

cause to allow for a warrantless arrest of Sieler under SDCL 23A–3–2.1.

### d. Failure to avoid increasing risk of harm

[¶ 34.] This factor means the officers must have either caused the harm to Walther or exposed her to a greater risk. *Gleason,* 1997 SD 102, ¶ 25, 568 N.W.2d at 487. We have also stated that failure to diminish harm is not enough under this factor. *Id.* Walther concedes this case primarily involves a situation where the officers may have failed to diminish harm. She does attempt to argue that there were affirmative actions on the part of the officers, but her arguments do nothing more than claim they were negligent. This is insufficient. *Id.*

[¶ 35.] Walther has failed in her burden to establish the existence of a special duty.

### [¶ 36.] 2. The trial court did not err in granting summary judgment in favor of KPKA and Dimension.

[¶ 37.] Walther claims the trial court erred in granting summary judgment to KPKA and Dimension, because it found there was no duty or proximate cause.

[¶ 38.] We must first examine if Walther has established that KPKA and Dimension owed a duty to protect her from Sieler's attack. Whether a duty exists is a question of law. *Schoenwald v. Farmers Coop. Ass'n of Marion,* 474 N.W.2d 519, 520 (S.D.1991). A duty can be created by statute or common law. *Poelstra v. Basin Elec. Power Coop.,* 1996 SD 36, ¶ 11, 545 N.W.2d 823, 826.

### a. Statutory duty

[¶ 39.] Walther claims SDCL 43–32–8 creates a duty for a landlord to protect against criminal acts of third parties. That statute provides, in relevant part:

> In every hiring of residential premises, whether in writing or parol, the lessor shall keep the premises and all common areas in reasonable repair and fit for human habitation and in good and safe working order during the term of the lease except when the disrepair has been caused by the negligent, willful or malicious conduct of the lessee or a person under his direction or control.

Walther asserts that, since the statute contains the word "shall" and directs that the premises is to be kept "safe," this creates a statutory duty on the part of KPKA and Dimension. We do not agree and hold this statute does not create a duty on the part of lessors to protect lessees from the criminal acts of third persons.

[¶ 40.] SDCL 43–32–8 provides that a lessor is to keep the premises in good repair and safe. The remedy for a violation of this, found in SDCL 43–32–9, is for the cost of repairs only. There is no indication that SDCL 43–32–8 is anything beyond a statute dealing with repairs of premises, and it creates no duty to protect a lessee from the criminal acts of third persons. *See Deem v. Charles E. Smith Management, Inc.,* 799 F.2d 944, 945–46 (4th Cir.1986); *Rodgers v. Rosen,* 737 P.2d 562, 563 (Okla.1987).

### b. Common-law duty

[¶ 41.] Walther also alleges a common-law duty exists per our holding in *Small v. McKennan Hosp.,* 437 N.W.2d 194 (S.D.1989) (*Small II*). There, we stated a duty to protect a person from the unlawful acts of a third person could arise if the following two elements were met: (1) the existence of a special relationship between the landowner and the injured party, and (2) a finding that the intentional criminal acts were foreseeable. *Id.* at 199.

### i. Special relationship

[¶ 42.] We hold no "special relationship" exists between a landlord and a tenant. Many other courts have also held no such special relationship exists. *See Doe v. Grosvenor Properties Ltd.,* 73 Haw. 158, 829 P.2d 512, 516–17 (1992) (holding the landlord-tenant relationship is not a "special relationship"); *Morgan v. Dalton Management Co.,* 117 Ill.App.3d 815, 73 Ill.Dec. 313, 454 N.E.2d 57, 61 (1983) (stating the landlord-tenant relationship is not considered a special relationship); *Cramer v. Balcor Property Management,* 312 S.C. 440, 441 S.E.2d 317, 318–19 (1994) (stating that landlords do not "owe an affirmative duty to protect tenants

pears to be no indication that they were living in    the same apartment.

from criminal activity merely by reason of the relationship"); *Miller v. Whitworth*, 193 W.Va. 262, 455 S.E.2d 821, 826 (1995) (observing that generally no special relationship exists between landlord and tenant, which imposes a duty on the part of the landlord to protect the tenant from the criminal activity of a third party).

[¶ 43.] Walther cites the Restatement (Second) of Torts, § 314A (1965) for the proposition that a special relationship exists with situations involving common carriers, innkeepers, possessors of land who hold it open to the public, and one who is required by law to take or who voluntarily takes the custody of another under certain circumstances. She notes that these categories are not meant to be exclusive, and cites to our opinion in *Small II* as an instance where we expanded the categories and held that a special relationship existed between a landowner and a business invitee. 437 N.W.2d at 199–200.

[¶ 44.] Some courts have considered the Restatement (Second) of Torts § 314A in the context of the landlord-tenant relationship, and specifically held that section does not apply. *See Doe*, 829 P.2d at 516–17. We agree and decline to extend the Restatement (Second) of Torts § 314A to the landlord-tenant relationship. The difference between a landlord-tenant relationship and that of a business invitee-landowner is significant:

> Tenants in a huge apartment complex, or a tenant on the second floor of a house converted to an apartment, do not live where the world is invited to come. Absent agreement, the landlord cannot be expected to protect them against the wiles of felonry any more than the society can always protect them upon the common streets and highways leading to their residence or indeed in their home itself.

> An apartment building is not a place of public resort where one who profits from the very public it invites must bear what losses that public may create. It is of its nature private and only for those specifically invited. The criminal can be expect-

ed anywhere, any time, and has been a risk of life for a long time.

*Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 745–46 (1984); *see also Cramer*, 441 S.E.2d at 318.

[¶ 45.] In this case, Sieler broke into Walther's apartment where he brutally raped and stabbed her. As terrible as the facts are, Walther has failed to establish there is a special relationship between her and Dimension and KPKA. The attack took place in Walther's own apartment, where she alone had the right of possession.[9]

### ii. Foreseeability

[¶ 46.] Even if Walther were able to establish that there was a special relationship between a landlord and tenant, she has failed to meet the second prong of our *Small II* test, foreseeability. *See* 437 N.W.2d at 199. We apply a totality of the circumstances test to determine foreseeability. *Small v. McKennan Hosp.*, 403 N.W.2d 410, 413 (S.D. 1987) (*Small I* ). We must determine if Walther has presented enough facts to create a jury question under our totality of the circumstances rule. *Id.*

[¶ 47.] Walther argues the Meadowland Apartments were in terrible physical condition and, specifically, the windows were in disrepair. She also claims the window Sieler crawled through was old and defective and had fallen out a few months prior to the attack. However, in her deposition, Walther acknowledged that the window was working properly.

[¶ 48.] Walther cannot now claim a version of the facts more favorable than her own testimony. *Loewen v. Hyman Freightways, Inc.*, 1997 SD 2, ¶ 16, 557 N.W.2d 764, 768. The window was working properly and Sieler was able to gain access only because it was left open by Walther, an act beyond the control of Dimension and KPKA. Other windows in the Meadowland Apartments may have been defective, however, that is completely unrelated to Walther's claim.

[¶ 49.] Walther also asserts the attack on her was foreseeable because the landlords

---

9. In this case, we are not asked to decide if a special relationship could exist between a landlord and tenant in common areas of an apartment complex. The facts of this case dictate that our holding be limited to criminal acts taking place in a tenant's own apartment.

were aware that persons could crawl through the windows. She alleges she made a complaint about some neighbors crawling through the basement windows to gain access to a laundry room. She also states her neighbor's child crawled through their second-story window to gain access to their apartment when they were locked out. Walther is unable to show it was foreseeable that Sieler could crawl through her second-story window. The incident she complained of involved a basement window, which would not make access through her second-story window foreseeable. As to the child that crawled through the neighbor's second-story window, there is no evidence that this was ever made aware to the landlords.

◼ [¶ 50.] Finally, Walther claims the attack on her was foreseeable because of the numerous other crimes that occurred in the apartment complex. She states that, under our holdings in *Small I* and *Small II*, the existence of these other crimes can establish foreseeability of the attack, even though they are unrelated and different in kind. This is a true statement given our specific rejection of the prior similar acts rule. *Small I*, 403 N.W.2d at 413. However, in this case, the lack of prior similar acts is significant, even though it is not the sole factor considered under the totality of the circumstances test.

[¶ 51.] In the *Small* decisions, it was critical to our holdings that parking ramps are unique in that they invite criminal activity. Also, the hospital was aware of the increased crime risk and there was testimony of prior general criminal conduct as well as expert testimony that security was inadequate in the parking ramp.

[¶ 52.] The situation with an apartment complex is different. It is made up of several tenants, each living in their own separate, private space, yet each living in close proximity with the others. While a general criminal element in a parking ramp can render the whole ramp unsafe and thus an attack fore-

seeable, a crime that occurs in one apartment or outside an apartment does not necessarily make another crime that happens in a different apartment foreseeable. *See Miller*, 455 S.E.2d at 826–27 (holding that, given the nature of apartment buildings and the relationship between landlord and tenant, the existence of prior unrelated crimes without some affirmative act or omission on the part of the landlord, does not make a particular crime foreseeable and thus no duty is imposed).

[¶ 53.] In viewing the totality of the circumstances, we hold that Walther has provided no facts to create an issue of foreseeability for a jury.[10]

### c. *Proximate cause*

◼ [¶ 54.] The trial court also held that, even if Walther were able to establish a duty on the part of Dimension and KPKA, her claims against them would fail because they were not the proximate cause of her injuries. Normally, proximate cause is an issue for the jury, but when legal minds cannot differ, summary judgment may be entered on proximate cause. *Holmes v. Wegman Oil Co.*, 492 N.W.2d 107, 114 (S.D.1992). Here, Sieler was the cause of Walther's injuries. KPKA and Dimension were not responsible for and took no actions that caused her injuries. The window through which Sieler gained entrance was working and locking properly, but was left open by Walther. No actions by KPKA and Dimension were the proximate cause of Walther's injuries.

[¶ 55.] **3. The trial court properly denied summary judgment to City and Officer Arnett on Walther's claim that they were negligent in not seeking immediate medical treatment for her.**

[¶ 56.] Officer Arnett and City claim they owed no duty to Walther, so they cannot be negligent in not seeking immediate medical treatment for her. We disagree.

---

10. Walther also claims the landlords were put on notice that she and Sieler had an abusive relationship. This may be true, as she was threatened with eviction based upon complaints that she and Sieler were always fighting. However, Walther also informed her landlords that the situation with Sieler was improving. Also, to hold that mere knowledge of disputes between a tenant and her boyfriend makes an attack foreseeable and thus raises a duty on the part of a landlord would be inappropriate. Surely what happens behind the closed doors of an apartment is not usually foreseeable to a landlord.

[¶ 57.] We begin by noting that this is not a case that falls under the public-duty rule or the related special-duty exception. Walther's claims as to this issue do not involve whether the government is responsible for failing to enforce a law to protect her from the acts of a third party. *See Tipton II,* 1997 SD 96, ¶ 12, 567 N.W.2d at 357 (stating the general rule as: "Local governments will not ordinarily be liable for the conduct of third parties where private persons are not."). Rather, this issue involves harm allegedly caused by Officer Arnett's failure to seek medical help once he came upon the scene.[11] We have held that "although 'there is no general duty to come to the assistance of a person ... unable to look out for himself ... once a person ... undertakes to render assistance, the law imposes on him the duty of reasonable care toward the assisted.'" *Erickson v. Lavielle,* 368 N.W.2d 624, 627 (S.D.1985) (quoting *Steckman v. Silver Moon,* 77 S.D. 206, 211, 90 N.W.2d 170, 173 (1958)); *see also Tipton II,* 1997 SD 96, ¶ 13, 567 N.W.2d at 358 (stating that this exception is similar to the special-duty rule, and it provides "that persons are generally not liable for failure to act, but once having acted, must proceed without negligence."). In viewing the facts in a light most favorable to Walther, as we must, we hold that there are genuine issues of material fact remaining for a jury to decide.

[¶ 58.] This case is different from the cases cited by City and Officer Arnett, holding that no duty exists where an officer sits idly by and does nothing. Here, Officer Arnett came upon Walther in her apartment. He then shut the door, thus possibly denying access to others who may have wanted to help. Also, he called for backup officers, but specifically refused medical assistance when asked if he wanted any. Officer Arnett did more than failing to aid Walther. His actions may have delayed her receipt of much needed medical treatment.

[¶ 59.] City and Officer Arnett also argue that their actions were not the proximate cause of Walther's injuries and, therefore, summary judgment should be granted in their favor. Proximate cause is usually a matter for a jury to decide. *See Holmes,* 492 N.W.2d at 114. The trial court held that at trial Walther would still bear the burden of proving that Officer Arnett's actions somehow caused, contributed, or increased her injuries. We agree, and hold the trial court was correct in denying summary judgment on this issue.

[¶ 60.] Affirmed.

[¶ 61.] AMUNDSON, KONENKAMP and GILBERTSON, JJ., and ANDERSON, Circuit Judge, concur.

[¶ 62.] JAMES W. ANDERSON, Circuit Judge, sitting for SABERS, J., disqualified.

---

11. Walther's claims against City are based on a respondeat superior theory.