1999 SD 163

E.P. and W.P., as Guardian Ad Litem for R.P., a Minor, Plaintiffs and Appellants,

v.

Deb RILEY, Doug Seim, Dawn Johnson, and Paula Pletsch, individually and in their capacities as Employees of the South Dakota Department of Social Services; John Does 3 – 5; and Michelle Lambert and Robert Lambert, Defendants and Appellees.

No. 20919.

Supreme Court of South Dakota.

Argued Sept. 15, 1999.

Decided Dec. 29, 1999.

Rehearing Denied Feb. 8, 2000.

Michael F. Marlow and Sheila S. Woodward of Johnson, Heidepriem, Miner, Marlow & Janklow, Yankton, South Dakota and David R. Strait of Austin, Hinderaker, Hopper, Strait & Bratland, Watertown, South Dakota, Attorneys for plaintiffs and appellants.

Michael J. Schaffer and Dana M. Van Beek of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Attorneys for defendants and appellees SDDSS and John Does.

Roy A. Wise of Richardson, Groseclose, Wyly, Wise & Sauck, Aberdeen, South Dakota, Attorneys for defendants and appellees Lamberts.

MILLER, Chief Justice.

[¶ 1.] In this opinion we clarify application of the public duty doctrine. In so doing, we hold that employees of the South Dakota Department of Social Services (DSS) owed a common law duty to protect a child from harm inflicted by a foster child with known dangerous propensities. We reverse summary judgment in favor of DSS employees because, under the immunity statute, genuine issues of material fact exist whether they acted in good faith in the placement activities of the foster child. We affirm summary judgment in favor of foster parents and hold that they did not owe a duty because the harm was not foreseeable to them.

1. Appellee Pletsch was the investigating social worker who was initially assigned the case of JH in October 1993 when DSS took legal custody of him. Later, in October 1993, JH's file was transferred to Riley, a DSS child protection worker. Riley transferred JH's file

**FACTS**

[¶ 2.] Appellees Deb Riley, Doug Seim, Dawn Johnson and Paula Pletsch (collectively "DSS employees") were at all material times social workers with the DSS in Watertown. Appellees Michelle and Robert Lambert (Lamberts) were contract foster parents for DSS who resided in Watertown. EP and WP (Parents), and their daughter RP, were neighbors of Lamberts. Michelle Lambert occasionally baby-sat Parents' children at their home.

[¶ 3.] In October 1993, 14–year–old JH, a boy who had been adjudged to be an abused and neglected child, was placed in the custody of DSS pending a decision on a permanent disposition.[1] He was initially placed with another family at their home in Watertown, but was removed on December 7, 1993, because of the impending birth of a child. JH was then transferred to Lamberts' home. He turned fifteen while living with them. JH had a history of being sexually abused—once at age seven by his mother's then-boyfriend, and a second time at age nine by an older cousin. At age eleven JH engaged in two sexual encounters with same-age female cousins. His first such encounter was later described by a DSS caseworker as "mutual," but the caseworker was "unsure" about the mutuality of the second encounter.

[¶ 4.] At the time JH was placed in the custody of DSS, foster care team meetings were routinely held to discuss the situation of foster children. The meetings often included DSS personnel, foster parents, the child, the child's birth parents, and any other significant individuals in the child's life, such as mental health professionals or school personnel. Such a team meeting was held concerning JH on November 22, 1993, while he was living with his first foster family, but neither foster parent was

to Doug Seim, another DSS social worker, in December 1993. Johnson was the DSS child protection supervisor who oversaw the activities of Pletsch, Riley and Seim at all times during the events leading up to this action.

in attendance. The record includes an affidavit by Mavis Miller, a secretary employed by the Human Services Agency in Watertown, stating that DSS employee Riley directed her not to invite JH's foster family to that meeting.

[¶ 5.] While JH was in DSS custody, two different psychologists interviewed him and filed reports with DSS employees. One report by Dr. Robert Packard filed on November 12, 1993, prior to the team meeting, noted that JH had been sexually abused at age seven and again in 1989, and that he had sexually abused one or two cousins in 1990. Dr. Packard described JH as developing some tendencies toward antisocial behavior and having some underlying anger and impulse control problems. The doctor predicted these traits would become more prominent and hardened unless JH had the opportunity to live in a more healthy environment. Notably, Dr. Packard did not predict that JH would become sexually deviant in any way. The other psychologist, Dr. Kevin O'Dell, interviewed JH in late December 1993 or early January 1994, after he was living with Lamberts. Dr. O'Dell called DSS employee Riley to discuss his report during late January or early February 1994.[2] He described JH as being an emotionally and mentally disturbed child in need of psychiatric help. Dr. O'Dell stated in his deposition that he told Riley that JH was at risk of becoming a sexual abuser. He claimed to have specifically told Riley that JH would act out, and that he was a "firecracker" or a "bomb ready to explode." Dr. O'Dell recommended that JH be placed in an inpatient treatment program rather than a foster home. JH continued to live in the Lamberts' foster home.

[¶ 6.] The parties disagree about the extent of DSS employees' knowledge of JH's sexual history at the time he was placed with Lamberts, and about how much information DSS employees relayed to Lamberts about JH's sexual history. DSS employee Riley claims that at the time JH's case was transferred to her from her co-worker Pletsch (before JH went to live with Lamberts), she was merely told about "mutual sexual exploration with same age cousins." She claims no knowledge of JH's sexual abuse by his mother's boyfriend. Riley does state, however, that when JH went to live with Lamberts, she believes she told them about his "mutual sexual activity between the cousins." She states that neither before nor after JH was placed with Lamberts did she have or obtain information that he had a propensity for sexual abuse of young children. In contrast, Lamberts claim they were not informed about JH's sexual history at all. Regardless of who knew what about JH's sexual history, Riley agreed in her deposition that it would be "critical" to share that kind of information with foster parents.

[¶ 7.] On February 19, 1994, Michelle Lambert went to Parents' home to babysit their children. JH followed his foster mother over to Parents' home shortly thereafter. While upstairs playing, JH made inappropriate sexual contact with RP. RP told a relative about the incident, and JH later admitted to having inappropriate sexual contact with the child on two separate occasions, once in late December 1993 and again on February 19, 1994.

[¶ 8.] On December 18, 1996, Parents brought suit as guardians ad litem for RP against DSS employees and Lamberts.[3] Parents alleged that DSS employees were negligent and acted in bad faith and with

---

2. Although Dr. O'Dell states in his affidavit that he spoke with Riley during late January or early February 1994, Riley states in her deposition that she left her position at the Watertown DSS office and moved to Aberdeen in late December 1993. This discrepancy and the question of whether Riley was even in the Watertown DSS office in late January or early February 1994 to receive Dr. O'Dell's

report is noteworthy, because a crucial factor in this case is the extent of DSS employees' knowledge about JH's sexual and psychological history.

3. The parties stipulated to the dismissal of other originally named defendants.

reckless indifference in the foster care placement of JH, which resulted in harm to RP. Parents also asserted a claim under 42 USC § 1983, alleging a violation of RP's constitutional rights. In their suit against Lamberts, Parents alleged Lamberts were negligent in failing to control the conduct of JH, which resulted in harm to RP. Both DSS employees' and Lamberts' motions for summary judgment were granted by the trial court.

[¶ 9.] On appeal, Parents raise the following issues:

1. Whether DSS employees and Lamberts owe a duty to protect RP.

2. Whether DSS employees are entitled to immunity under SDCL 26–8A–14.

3. Whether SDCL 26–8A–14 is constitutional as applied to the actions of DSS employees.

4. Whether DSS employees violated RP's constitutional rights under 42 USC § 1983.

5. Whether the trial judge's ruling which limited access to confidential DSS records was proper.

## STANDARD OF REVIEW

[¶ 10.] Our review of a trial court's granting of summary judgment is well settled.

"In reviewing a grant or a denial of summary judgment under SDCL 15–5–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper."

*Millard v. City of Sioux Falls,* 1999 SD 18, ¶ 8, 589 N.W.2d 217, 218 (quoting *Walther v. KPKA Meadowlands Ltd. Partner,* 1998 SD 78, ¶ 14, 581 N.W.2d 527, 531 (citations omitted)).

## DECISION

[¶ 11.] **1. DSS employees owed a duty to protect RP; foster parents Lamberts did not owe a duty to protect RP.**

[¶ 12.] The trial court determined that neither DSS employees nor Lamberts owed a duty to prevent JH from harming RP. First, considering the issue under § 315 of the Restatement (Second) of Torts,[4] the trial judge concluded that neither defendant had the requisite knowledge necessary to satisfy the "special relationship" exception to the general rule that there exists no duty to control the conduct of third persons. The trial judge next concluded that neither defendant had a duty under § 319 of the Restatement,[5] because they had not "taken charge" of JH within the meaning of that term.

4. Restatement (Second) of Torts § 315 provides:
 There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
 (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
 (b) a special relation exists between the actor and the other which gives to the other a right to protection.

5. Restatement (Second) of Torts § 319 provides:
 One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

[¶ 13.] Parents argue, however, that both defendants did indeed take charge of JH and, thus applying §§ 319 and 315(a) of the Restatement, they owed a duty to RP. Further, Parents argue that the public duty doctrine is inapplicable to this case. Alternately, they argue that if the public duty doctrine is applicable, then § 315(b), which is commonly known as the "special relationship exception" to the public duty doctrine, applies.

[¶ 14.] For the reasons set forth below, we hold the public duty doctrine is inapplicable to the circumstances of this case. Further, we hold DSS employees owed a duty to protect RP from JH, but Lamberts did not. The duty issues concerning DSS employees and Lamberts are addressed separately.

### a. DSS employees
*The public duty doctrine is inapplicable to this situation.*

■ [¶ 15.] "Though some consider [the public duty] doctrine a form of immunity, we view the rule principally within the framework of duty – if none exists, then no liability may affix." *Tipton v. Town of Tabor*, 1997 SD 96, ¶ 12, 567 N.W.2d 351, 357 (*Tipton II* ). The public duty doctrine declares that the "government owes a duty of protection to the public, not to particular persons or classes." *Id.*, ¶ 10, 567 N.W.2d at 356. It "acknowledges that many 'enactments and regulations are intended only for the purpose of securing to individuals the enjoyment of rights and privileges to which they are entitled as members of the public, rather than for the purpose of protecting any individual from harm.' " *Id.* (quoting Restatement (Second) of Torts § 288 cmt. c (1965)). South Dakota has specifically refused to abrogate the public duty doctrine. *Gleason v. Peters*, 1997 SD 102, ¶ 9, 568 N.W.2d 482, 484.

[¶ 16.] The public duty doctrine has been examined at length by this Court on at least four occasions. *Hagen v. City of Sioux Falls*, 464 N.W.2d 396 (S.D.1990); *Tipton v. Town of Tabor*, 538 N.W.2d 783 (S.D.1995) *(Tipton I)*; *Tipton II; Gleason;* and *Walther*. In *Hagen,* the issue was whether a city building code imposed a duty on the city building inspection office to a homeowner for allegedly negligent inspection and approval of faulty construction. This Court found that the language of the building code, upon which the homeowner-plaintiffs based their claim of negligent inspection, was aimed only at public safety or general welfare purposes. *Hagen*, 464 N.W.2d at 399. The building code did not create an obligation to a specific class of individual members of the public; rather, it created only a general duty to the public as a community. *Id.* at 400. Thus, we held the building code could not support the homeowner's negligence claim against the city building inspector's office because there was no duty established. *Id. Hagen* set forth limited parameters in which a duty could be imposed for governmental action; it focused solely on the language of the building code to determine whether the existent duty was public or special. *Id.* at 399.

■ [¶ 17.] In *Tipton I*, we rejected *Hagen's* bright-line rule as being "needlessly restrictive and arbitrary." *Tipton I*, 538 N.W.2d at 787. Instead, we adopted Minnesota's approach, which looks at four factors to determine whether governmental action creates a duty to individuals as opposed to the community at large:

Whether the state ... assumes to act for the protection of individuals should depend on at least four factors, including:

1) the state's actual knowledge of the dangerous condition;

2) reasonable reliance by person on the state's representations and conduct;

3) an ordinance or statute that sets forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and

4) failure by the state to use due care to avoid increasing the risk of harm.

*Id.* At issue in *Tipton I* was whether county and city animal code provisions imposed a duty upon those entities to control or remove certain wolf-dog hybrids owned by a private individual. . The suit was brought by the parents of a four-year-old girl who was mauled by the animals when she wandered near their cage. We remanded the *Tipton I* case for reconsideration under our newly adopted public duty/special duty guidelines. *Id.* at 788.

[¶ 18.] The case made its way back to this Court in *Tipton II*. Again we were faced with the question whether city and county officials owed a "special duty" to protect a four-year-old girl from being mauled by wolf-dog hybrids that were caged in a nearby yard. Under the four *Tipton I* special-duty factors, we concluded the plaintiffs did not establish a special duty owed to them as individuals beyond that owed to the general public. *Tipton II*, 1997 SD 96, ¶ 41, 567 N.W.2d at 367. The public duty doctrine was found to be applicable to the circumstances of the case, and there was no special duty exception established. *Id.*

[¶ 19.] Throughout *Tipton II*, analysis of the public duty doctrine explicitly and implicitly centered on law enforcement and other public safety scenarios. Particularly reinforcing the idea that the public duty doctrine is aimed at law enforcement and public safety, is a passage that reads:

> Essentially, the rule declares government owes a duty of protection to the public, not to particular persons or classes. Sound reasons support this doctrine. *Furnishing public safety always involves allocating limited resources. Law enforcement entails more than simply reacting to violations; it encompasses the art of keeping the peace.* Deploying finite resources to achieve these goals is a legislative and executive policy function. To allow individuals to influence through private litigation how re-

sources must be disposed would render government administration chaotic and enfeebled. Unrestricted liability might discourage communities from acting at all or encourage action merely to avoid suit, without regard to the common good. *The rule promotes accountability for offenders, rather than police who through mistake fail to thwart offenses. Otherwise, lawbreaker culpability becomes increasingly irrelevant with liability focused not on the true malefactors, but on local governments.*

*Id.,* ¶ 10, 567 N.W.2d at 356 (footnotes omitted) (emphasis added).

[¶ 20.] Later, in *Gleason*, we affirmed application of the public duty doctrine to situations involving law enforcement or public safety. There we held a county and its deputy sheriffs owed no special duty for failure to break up a party (other than that owed to the general public) to a teenager who was beaten at the party. *Gleason*, 1997 SD 102, ¶ 26, 568 N.W.2d at 487.

[¶ 21.] In *Walther*, this Court most recently reaffirmed the limitation of the public duty doctrine to situations involving law enforcement. There the issue was whether a police department owed a duty to the plaintiff to prevent her boyfriend's attack. We stated: "Generally, the law imposes no duty to prevent the misconduct of a third person. Thus, police officers are generally protected from liability through what is termed the public duty rule. The rule provides that the police owe a duty to the public at large and not to an individual or smaller class of individuals." *Walther*, 1998 SD 78, ¶ 17, 581 N.W.2d at 531 (citations omitted). After analyzing the situation under the four-factor *Tipton I* test, we held the plaintiff did not establish the existence of a special duty owed to her other than that owed to the public at large. *Id.,* ¶ 35, 581 N.W.2d at 535.

[¶ 22.] Upon reviewing our previous public duty doctrine cases, we now specifically clarify that the public duty rule

extends only to issues involving law enforcement or public safety. Limiting the scope of the public duty doctrine to those types of situations finds support in other jurisdictions. *See generally* John H. Derrick, Annotation, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory that Only General, Not Particular, Duty was Owed Under Circumstances,* 38 A.L.R.4th 1194 § 3 (1985) (surveying cases invoking the public duty doctrine); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 131, at 1049–50 (5thEd. 1984) (summarizing cases which hold that a government's failure to provide police or fire protection, or to enforce its own public safety laws, is still immunized from liability on the ground that the duty to protect is owed to the public at large and not to any particular person who might be injured).

[¶ 23.] Under this clarified interpretation of the public duty doctrine, we hold the rule is inapplicable to the instant case. DSS employees' actions cannot be deemed "law enforcement" in its traditionally understood sense. The term law enforcement generally envisions police protection. Nor were DSS employees' actions within the ambit of public safety. Their duty was to provide placement for and supervision of an abused child (JH) while he was in the Department's legal custody. DSS employees were charged with a limited responsibility (placement and supervision) to a limited class of intended beneficiaries (abused and neglected children). Their jobs did not involve either law enforcement or public safety duties owed to the general public.

### b. DSS employees owed a common law duty to protect RP.

[¶ 24.] "Tort liability depends upon the existence and breach of duty, and unless a specific statute creates a legal obligation, ascertaining a duty and defining it limitations, as we have said, remain a function of the courts." *Tipton II,* 1997 SD 96, ¶ 12, 567 N.W.2d at 357. The existence of a duty is a threshold issue in any case of tort liability. *Hagen,* 464 N.W.2d at 398. Whether a duty exists is a matter of law for the court to determine. *Id.* (citing Gilbert v. United National Bank, 436 N.W.2d 23, 27 (S.D.1989)).

[¶ 25.] Parents argue that §§ 315(a) and 319 impose a common-law duty upon DSS employees to control the conduct of JH by virtue of their relationship with him. More specifically, Parents claim that DSS employees "took charge" of JH within the meaning of § 319, because they obtained legal custody on October 7, 1993. Parents also assert that DSS employees maintained control over JH's activities, as evidenced by their authority to transfer him between foster homes, to monitor his school activities, to monitor his overall behavior in the foster care program, and to transfer him to a secure facility, as was done after he inappropriately touched RP.

[¶ 26.] Generally, the law imposes no duty to prevent the misconduct of a third person. *Walther,* 1998 SD 78, ¶ 17, 581 N.W.2d at 531; *Gleason,* 1997 SD 102, ¶ 8, 568 N.W.2d at 484. However, " '[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.' " *Small v. McKennan Hospital,* 403 N.W.2d 410, 413 (S.D.1987) (*Small I* ) (quoting Restatement (Second) of Torts § 319 (1965)).

[¶ 27.] *Small I* presented this Court with an opportunity to decide whether an individual who has control over another with dangerous propensities owes a duty to a third person. In *Small I,* the husband of a woman who was abducted from a hospital parking lot and murdered by a paroled convict sued the hospital, the state parole board and the parole officer, alleging that each owed a duty to his wife under § 319. In affirming the trial court's summary judgment in favor of the parole officer, we focused on whether that particular defen-

dant had "taken charge" of the parolee sufficiently to create a duty under § 319. *Id.* Although the parolee was on maximum supervision status, his parole officer was only required to see him twice a month, in addition to visiting his home and conducting an employment check once a month. We held such supervision was not sufficient to show the parole officer had taken charge of the parolee, because the parolee was free to conduct his day-to-day affairs and, unlike other custodial situations, the parole officer was not responsible for supervising him on a daily basis. *Id.* at 414. Thus, the parole officer had no duty to protect the plaintiff's wife from harm by the parolee. *Id.*

▮ [¶ 28.] In contrast to the parole officer in *Small I*, we hold DSS employees had sufficient control over JH to establish a common law duty to protect RP. DSS had both legal custody and supervisory control of JH at the time of the incident. In addition, the record shows that DSS employee Seim had at least four personal contacts with JH during the period from December 16, 1993, to January 27, 1994, and made numerous phone contacts to others regarding his care and supervision during that time. Seim states in the record that as case manager of JH, his duties were to meet with the boy and the foster family and monitor visits with the natural mother. DSS regulations describe the following agency responsibilities in the provision of child protective services: placement in and supervision of foster care, medical and dental care, and adequate incidental, clothing and educational expenses, to name a few. ARSD 67:42:09:13(6), 67:42:09:19, 67:42:09:22 (1997). In addition, DSS is responsible for providing the following services if necessary: psychiatric, legal, religious, special education, and

physical therapy services. ARSD 67:42:09:22 (1997). These examples from the record show that DSS employees had control and supervisory responsibility of JH.

[¶ 29.] Further, while JH was in their custody, DSS employees were given information that should have caused concern about his propensity to harm others. Particularly, the reports by Dr. Packard and Dr. O'Dell described earlier should have put DSS employees on notice of JH's potentially dangerous tendencies. They "knew or should have known" that JH was "likely to cause bodily harm to others if not controlled," therefore, they were "under a duty to exercise reasonable care to control him to prevent him from doing such harm."[6] *Small I*, 403 N.W.2d at 413.

*c. Lamberts did not owe a duty to RP*

▮ [¶ 30.] Parents claim Lamberts had a duty to RP because they "took charge" of JH; they had physical custody and control of him and were directly responsible for his day-to-day supervision. They also claim that JH's actions were foreseeable to Lamberts, since Michelle Lambert was allegedly on notice as to his sexual propensities by DSS employee Riley and his first foster mother. We disagree as to the sufficiency of the notice.

▮ [¶ 31.] While our opinion in *Small I* did not explicitly announce it as a factor to consider when deciding whether a duty exists to control the conduct of a person with dangerous propensities, the trial court in the instant case considered foreseeability in addition to control in analyzing whether a duty existed. This two-prong test is appropriate, because *foreseeability* is as important as *control* in determining whether a duty to control the

6. After all, if DSS did not have control of JH, who did? When JH was placed into the temporary custody of DSS on October 7, 1993, he was only 14 years old. He was not yet of majority age, nor was he an emancipated minor. Along with revoking his mother's legal and physical custody came the responsibility of supervising JH, and accountability in the event he misbehaved. Although DSS was not actually JH's parent, it assumed that role by taking custody. In the role of de facto parent, DSS employees owed a duty to exercise reasonable care to control JH. *See* Restatement (Second) of Torts § 316 (1965).

conduct of another with dangerous propensities exists. Other courts have created two-part tests for determining whether a duty exists to control the conduct of another with dangerous propensities. *See, e.g., Caldwell v. Idaho Youth Ranch,* 132 Idaho 120, 968 P.2d 215, 218–19 (1998) (Idaho courts must first determine whether the defendant actually had control over the third person, then they must decide whether the harm caused by the third person was foreseeable); *Ryan v. State,* 150 Ariz. 549, 724 P.2d 1218, 1221–22 (Ct. App.1986) (although it was shown that the state defendant had taken charge of an escaped juvenile offender who shot a third party, it was not shown that the juvenile's actions were foreseeable); *Robertson v. Wentz,* 187 Cal.App.3d 1281, 232 Cal.Rptr. 634, 639 (1986) (under common law a mother is not liable for negligence unless she knew she could control son's murderous actions, and knew of the risk that he would harm third party if not controlled). We agree and now adopt that test.

[¶ 32.] Under our new two-prong test, we must determine whether Lamberts had control of JH and whether his actions were foreseeable. As to the first factor, it is undisputed that Lamberts had physical, day-to-day custody and control over JH, sufficient to satisfy the legal requirements. However, Parents have not sufficiently shown that Lamberts could or should have foreseen JH's actions because DSS failed to notify them.

[¶ 33.] The question of foreseeability is ordinarily a question of fact. *Small I,* 403 N.W.2d at 413. We must determine whether the plaintiff has presented sufficient facts to create a jury question under the "totality of circumstances" rule. *Id.*

[¶ 34.] Contrary to Parents' assertions, we do not find there is adequate evidence to create a jury question of foreseeability in this case. The only facts presented by Parents to show that Lamberts may have had knowledge of JH's allegedly dangerous propensities are the depositions of DSS employee Riley and JH's first foster mother. Riley states in her deposition that she *believes* she told Lamberts of his "mutual sexual activity between the cousins." The first foster mother also only *believes* she told Michelle Lambert that he had been sexually molested as a boy. There is no evidence that Lamberts were made aware of the two psychologists' reports, or that they were included in any DSS team meetings, where concerns about his history or propensities might have come to light. In fact, Lamberts deny ever receiving any information about JH's sexual history at all. The scant amount of evidence presented by Parents is just not sufficient to create a jury question of foreseeability.

[¶ 35.] We therefore affirm the trial court's summary judgment in favor of Lamberts.

[¶ 36.] **2. Genuine issues of material fact exist whether DSS employees acted in good faith under SDCL 26–8A–14.**

[¶ 37.] The trial court concluded there was no evidence in the record, "not even inferential," that showed DSS employees acted with improper motives or otherwise in bad faith. The court found the employees to be immune under SDCL 26–8A–14.[7]

---

7. SDCL 26–8A–14 provides:

Any person or party participating in good faith in the making of a report or the submitting of copies of medical examination, treatment or hospitalization records pursuant to §§ 26–8A–3 to 26–8A–8, inclusive, or pursuant to any other provisions of this chapter, is immune from any liability, civil or criminal, that might otherwise be incurred or imposed, and has the same immunity for participation in any judicial proceeding resulting from the report. Immunity also extends in the same manner to persons requesting the taking of photographs and X rays pursuant to § 26–8A–16, to persons taking the photographs and X rays, to child protection teams established by the secretary of social services, to public officials or employees involved in the investigation and

Parents argue on appeal, however, that DSS employees are not protected by the immunity statute because it only applies to the "placement" activities, not to the "after placement" activities in which the employees engaged with JH. Parents argue that even if the statute does apply, DSS employees acted in bad faith and, therefore, are not entitled to its protection.

[¶ 38.] We agree with the trial court that the immunity statute is applicable to this case. Our holding in *B.W. v. Meade County*, 534 N.W.2d 595 (S.D.1995), is dispositive. In *B.W.*, we found that SDCL 26–8A–14 applied to a suit brought against a DSS social worker and a deputy sheriff, who investigated the reported abuse of a child but negligently failed to request a medical examination. The child was later found to have been abused by her father. After reviewing the statutory language, we held it applied to "public officials and employees involved in the investigation and treatment of child abuse and neglect." *Id.* at 597. We found there to be "no room for an alternate interpretation" of the statute. *Id.*

[¶ 39.] As in *B.W.*, it is clear the immunity provisions of SDCL 26–8A–14 apply to the placement activities of DSS

employees involving JH. According to the statute, immunity extends to "public officials or employees involved in the investigation and treatment of a child abuse or neglect or making a temporary placement of the child." This specific phraseology covers the actions of DSS employees here. The only question remaining is whether DSS employees acted in good faith. *B.W.*, 534 N.W.2d at 597.

[¶ 40.] "Acting in good faith denotes performing honestly, with proper motive, even if negligently." *Id.* at 598 (other citations omitted). "The standard for determining good faith is a defendant's honest belief in the suitability of the actions taken." *Id.* "'Bad faith' is the antithesis of good faith and has been defined in the cases to be when a thing is done dishonestly and not merely negligently. It is also defined as that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Cotton v. Stange*, 1998 SD 81, ¶ 9 n. 1, 582 N.W.2d 25, 28 n. 1 (citations omitted). The presence or absence of good faith requires an examination of the mental state of the person under scrutiny. *Id.*, ¶ 11, 582 N.W.2d at 29. Though the standard is a subjective one, a person claiming lack of

treatment of child abuse or neglect or making a temporary placement of the child pursuant to this chapter, or to any person who in good faith cooperates with a child protection team or the department of social services in investigation, placement or a treatment plan. The provisions of this section or any other section granting or allowing the grant of immunity do not extend to any person alleged to have committed an act or acts of child abuse or neglect.
Compare this grant of statutory immunity to SDCL 21–32–17 and 21–32A–2, which codify the general doctrine of sovereign immunity, except where public liability insurance or a risk sharing pool is available. For a thorough review of South Dakota's doctrine of sovereign immunity, public liability insurance and the PEPL fund, *see Kyllo v. Panzer*, 535 N.W.2d 896, 898–900 (S.D.1995). *Kyllo* held that SDCL 21–23–17 and 21–32A–2 were unconstitutional to the extent they waived sovereign immunity

to state employees performing ministerial, as opposed to discretionary, functions.
The PEPL fund provides "payment of valid tort claims against all member public entities of the state and their officers and employees for all liability they may incur based upon negligence in the operation of motor vehicles or negligence in performing other acts within an employee's scope of employment." SDCL 3–22–1. Under the current statutory scheme, unless a claim falls within PEPL fund coverage, the doctrine of sovereign immunity applies to abrogate that claim. *Kyllo* 535 N.W.2d at 900. However, the PEPL fund does not cover "noneconomic damages, including, but not limited to, damages for pain, suffering, inconvenience, physical impairment, disfigurement, loss of society and companionship, and hedonic damages[.]" *Id.*, quoting The Public Entity Pool for Liability, *Memorandum of Liability Coverage to the Employees of the State of South Dakota*, Apr. 4, 1990.

good faith can only show the same by circumstantial evidence, which must be measured objectively. *Id.*

 [¶ 41.] Guided by the standard set forth in *B.W.* and *Cotton,* we find there are genuine issues of material fact whether DSS employees acted in good faith during the placement of JH. First, there is conflicting testimony about how much information DSS employees relayed to Lamberts concerning JH's sexual history at the time he was placed in their home. DSS employee Riley believes she told Lamberts about his "mutual sexual activity" with a cousin. In contrast, Lamberts claim they were not informed about his sexual history at all. DSS employee Seim denies having any knowledge of JH's sexual history at the time he assumed the case from Riley in December 1993, and he denies ever conveying any such information to Lamberts. In addition, the record shows that although DSS employees were informed of critical information about JH's allegedly dangerous propensities via two psychologists' reports, they do not recall receiving that information. DSS policy mandates, and by their own admission DSS employees agree, that as much information as possible must be shared with the child's foster parents. Department of Social Services, Child Protection Services Procedures Manual, Family Foster Home Care, 7 (12/93); Department of Social Services, Licensing Manual, Chapter V, Appendix L, 3 (02–94) ("Share as much information that is available about the child with the foster parents ... Any additional information (i.e., medical records, behavior patterns and problems, school records, etc.) which is obtained later, is also to be shared with the foster parents.") Yet, there is no indication this was done. Finally, DSS's own administrative rule states, "A foster parent shall take part in case planning for the child." ARSD 67:42:05:13(2) (1997). *See also* ARSD 67:42:01:06 (1997) ("The [foster parent] shall also be able to participate with the department or a responsible party in devising and executing a case service plan for a [child].") Despite these regulations, there appears to be evidence that DSS purposely excluded the first foster family from team meetings concerning JH.

[¶ 42.] Viewing this evidence in a light most favorable to Parents, genuine issues of material fact exist whether DSS employees acted in good faith in the placement of JH, which would otherwise entitle them to immunity under SDCL 26–8A–14. Therefore, we reverse summary judgment in their favor and remand to the trial court for reconsideration in light of this opinion. Our disposition of this issue precludes the necessity of considering the constitutional questions presented.

[¶ 43.] **3. The trial judge's ruling which limited access to confidential DSS records was proper.**

 [¶ 44.] Prior to trial Parents sought discovery of DSS records pertaining to JH. DSS provided its files on JH and RP to the trial court, as well as selected pages from the Child Protection Procedures Manual. After making an *in camera* review of these documents, the court allowed the release of records concerning JH's abuse, neglect and sexual history that occurred prior to the incident with RP. The court also allowed the release of RP's DSS file, as well as selected pages from the Child Protection Procedures Manual. However, the court ordered that records in JH's DSS file after the incident with RP remain confidential. It reasoned that such documents were protected by the work-product privilege because "defendants had notice early on that litigation was likely to ensue," and the records "were prepared in anticipation of litigation." Parents subsequently obtained consent and authorization forms from JH and his mother to allow the release of JH's DSS file, in another attempt to discover its contents. The trial court again denied the request, stating that the consent forms did not "have the legal effect of removing these files from confidential status." Parents appeal the trial judge's ruling, arguing that DSS em-

ployees are in essence hiding behind the confidentiality statutes in order to "protect themselves from evidence of their misconduct." We disagree.

[¶ 45.] A trial court's evidentiary rulings "are presumed correct and are reviewed under an abuse of discretion standard." *State v. Larson*, 1998 SD 80, ¶ 10, 582 N.W.2d 15, 17 (citing *State v. Goodroad*, 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129 (citation omitted)). " 'The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion.' " *Id.*

[¶ 46.] The trial judge made his decision based upon DSS's attorney-client privilege and the work-product doctrine, as well as the confidentiality provisions at SDCL 26–6–20, 26–8A–13 and 26–7A–27. The trial court stated that "the majority of [JH's DSS] file pertains to the period of time after the incident in question," and was "prepared in anticipation of litigation." Also, JH was a minor child who had been adjudged to be abused and neglected at the time of the assault against RP. For these reasons, the trial judge properly ruled that JH's records at DSS could not be disclosed. We affirm the trial judge's evidentiary ruling.

[¶ 47.] Affirmed in part, reversed in part and remanded.

[¶ 48.] SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

